662 A.2d 536

MORTGAGELINQ CORPORATION AND FEDERAL HOME LOAN MORTGAGE CORPORATION, PLAINTIFFS–APPELLANTS, v. COMMONWEALTH LAND TITLE INSURANCE COMPANY, EDWARD B. CAVALLARO, SR., CONTINENTAL TITLE INSURANCE COMPANY, ELIZABETH A. KEHOE, AND LAWYERS TITLE INSURANCE CORPORATION, DEFENDANTS–RESPONDENTS, AND MARKLAND TITLE SERVICES, INC., AND ROBERTA A. RANKIN, DEFENDANTS.

Argued March 27, 1995—Decided August 1, 1995.

*John Philip Kirchner* argued the cause for appellants (*Flaster, Greenberg, Wallenstein, Roderick, Spirgel, Zuckerman, Skinner & Kirchner,* attorneys).

*Maureen S. Binetti* argued the cause for respondent Lawyers Title Insurance Corporation (*Wilentz, Goldman & Spitzer,* attorneys).

*Michael N. Onufrak* argued the cause for respondents Commonwealth Land Title Insurance Company, Edward B. Cavallaro, Sr., Continental Title Insurance Company, and Elizabeth A. Kehoe (*White and Williams,* attorneys for Commonwealth Land Title

Insurance Company; *Miller, Alfano & Raspanti,* attorneys for Elizabeth A. Kehoe; *Duane, Morris & Heckscher,* attorneys for Continental Title Insurance Company; and *John Wendell Beavers & Assoc.,* attorneys for Edward B. Cavallaro, Sr.; *Mr. Onufrak, Ann Weikers, Steven M. Janove, Joshua Sarner,* and *John Wendell Beavers,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This is one of a series of entire controversy cases decided this term. *See Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 662 *A.*2d 509 (1995); *Mystic Isle Dev. Corp. v. Perskie & Nehmad,* 142 *N.J.* 310, 662 *A.*2d 523 (1995); *DiTrolio v. Antiles,* 142 *N.J.* 253, 662 *A.*2d 494 (1995). Each case presents a slightly different aspect of the problems that have arisen in the application of the entire controversy doctrine. The issue in this case, most broadly stated, is whether the doctrine has an extraterritorial effect. The specific question is whether New Jersey courts are obliged to entertain claims against parties that could have been joined with substantially similar claims pursued by the same plaintiffs against other parties elsewhere.

█ We hold that when a party deliberately chooses to fragment litigation by suing certain parties in another jurisdiction and withholds claims against other parties, a New Jersey court need not later entertain the claims against the omitted parties if jurisdiction was available in the first forum. In doing so we do not export our entire controversy doctrine to other jurisdictions, but merely hold that our notions of procedural fairness do not permit the claims that could have been brought elsewhere to be brought in New Jersey. This ruling presupposes that when the procedural rules of foreign jurisdictions permit the omitted claims to be brought later, the foreign jurisdiction is free to entertain such claims. Just as we do not seek to export our procedural requirements of party joinder, we do not seek to export any preclusive effect to our rules of party joinder.

## I

The case arises from a massive fraud committed on the plaintiff mortgage lender, Mortgagelinq Corporation (Mortgagelinq), and the Federal Home Loan Mortgage Corporation (Freddie Mac), assignee of some of the loans.[1]  There is more than enough blame to go around.  Defendants in this case, principally South Jersey title insurance companies, are allegedly accessories to the fraud. What happened was deceptively simple.  The principal perpetrators of the fraud were based in Pennsylvania (the Pennsylvania defendants).  They purported to be engaged in the acquisition and development of properties, but they were actually engaged in a shell game of selling properties to themselves.  They elevated the art of the deal to new heights.

A brief of defendant Lawyers Title Insurance Corporation describes the scheme succinctly.  The Pennsylvania defendants would purchase property from its owner for a purchase price near its fair market value (the A transaction).  The property was fraudulently resold on the same day to another Pennsylvania defendant (the B transaction) at a price substantially higher than the purchase price of the A transaction.  All but one of the twenty-four mortgage transactions alleged to be part of the fraudulent scheme involved property located within Atlantic County, New Jersey.  The transactions took place between May 1990 and February 1991.  In each instance, Mortgagelinq, a New Jersey/Pennsylvania-based mortgage lender, provided mortgage financing based on the inflated purchase price in the B transaction. Mortgagelinq sold some of the mortgages to Freddie Mac.  The Pennsylvania defendants pocketed the difference between the real price and the fake price.  In fact, sometimes the sham deals closed before the legitimate deals.  Plaintiffs allege that the title companies who closed title in those transactions must have been aware

---

[1] We will draw upon the procedural history and statements of facts as set forth in defendants' briefs.

of the fraud, which involved the same parties repeatedly acquiring properties and reselling them at significantly increased prices.

When the scam collapsed, the lenders were left with inadequate collateral. On March 13, 1991, Mortgagelinq sued the Pennsylvania defendants in the U.S. District Court for the Eastern District of Pennsylvania. Plaintiffs described that action (*Mortgagelinq I*) as an action "against the central figures in the fraudulent scheme." Those figures included a mortgage broker, a principal and several employees of that broker, an appraiser, an individual who "managed the affairs" of the corporate defendants (the shell corporations), the attorneys who received fees in connection with the transactions, a real estate agency and its employees, an insurance agency and its employees, and an individual who purportedly reviewed the alleged fraudulent appraisals.

On January 31, 1992, Freddie Mac sought to intervene as a plaintiff in *Mortgagelinq I*. The District Court granted its unopposed motion by an order dated February 14, 1992. One day prior to the entry of that order, Mortgagelinq and Freddie Mac filed the complaint in this case in the Superior Court, Law Division, Camden County. Defendants in this action are three title insurance companies, a title agency, and three individuals alleged to be employees of either the title insurance companies or the title agency (the New Jersey defendants).

The allegations of the *Mortgagelinq II* complaint filed in New Jersey involve the same twenty-four mortgage transactions that formed the basis for the allegations contained in the *Mortgagelinq I* complaint in Pennsylvania. The scheme and its alleged effect upon plaintiffs are apparently identical.

After the filing of the *Mortgagelinq II* complaint, some of the *Mortgagelinq I* defendants sought to compel the joinder of the New Jersey defendants in the Pennsylvania action as either direct defendants or third-party defendants. Both Mortgagelinq and Freddie Mac opposed those applications, asserting that the Pennsylvania defendants (as well as the plaintiffs) had known of the role of the New Jersey defendants in the underlying transactions

since the inception of *Mortgagelinq I*. The district court refused to join the New Jersey defendants in the proceedings pending there.

Some of the New Jersey defendants then moved to dismiss the complaints filed against them in New Jersey on the basis of the entire controversy doctrine and other grounds. The New Jersey defendants asserted that plaintiffs deliberately delayed filing their New Jersey action until after the time perioa allowed for joinder in the federal action had expired. The Law Division granted the motion and dismissed the complaints on the basis of the entire controversy doctrine.

The Law Division found that Mortgagelinq and Freddie Mac were aware of their causes of action against the omitted parties, the New Jersey defendants, at least as early as the filing date of the federal action in Pennsylvania, and that "the subject matter is identical in both suits and that plaintiffs affirmatively chose to bifurcate from the federal action trial of the causes against the New Jersey defendants despite this fact." 262 *N.J.Super.* 178, 183, 620 *A.*2d 456 (Law Div.1992). The court also stated that "the parties proceeded against in New Jersey were amenable to *in personam* jurisdiction by the Pennsylvania federal court, either by virtue of their domiciles in that state or their business contacts with it." *Id.* at 189, 620 *A.*2d 456.

Finding that "the issues, facts, causes of action and transactions in both cases were virtually identical," *id.* at 189, 620 *A.*2d 456, and that the plaintiffs had deliberately withheld their claims in the first action, the court held that "the entire controversy doctrine operates to bar suits against parties which could and should have been joined in a previous suit despite the fact that the earlier suit was brought in another state or in federal court." *Id.* at 190, 620 *A.*2d 456. The court concluded that such a result was "fair to the parties of this and similar cases and will prevent prejudice to the omitted parties and the wasteful manipulations of the New Jersey courts such as occurred here." *Ibid.* (Because the trial court's

finding was apparently not based on plaintiffs' motivations, we need not discuss such issues.)

Plaintiffs later sought to have the Law Division amend the "with prejudice aspect" of its orders of dismissal. The court declined to do so, holding that it intended its prior ruling to bar litigation of plaintiffs' claims in New Jersey pursuant to the entire controversy doctrine.

Thereafter, on September 11, 1992, plaintiffs filed a complaint against the New Jersey defendants in the U.S. District Court for the Eastern District of Pennsylvania (*Mortgagelinq III* ).[2] In lieu of filing an answer to the complaint in *Mortgagelinq III,* all of the New Jersey defendants moved to dismiss that complaint on the basis of the Full Faith and Credit Clause of the U.S. Constitution. The district court denied those motions, and noted that once the New Jersey ruling dismissing plaintiffs' claims became final, that judgment might preclude plaintiffs from pursuing further action against the New Jersey defendants in federal courts.  On plaintiffs' appeal of *Mortgagelinq II,* the Appellate Division affirmed the Law Division's decision dismissing the complaint.  275 *N.J.Super.* 79, 645 *A.*2d 787 (1994).

We granted the plaintiffs' petition for certification.  138 *N.J.* 270, 649 *A.*2d 1290 (1994).

## II

In *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 476 *A.*2d 250 (1984), we realized that the time had come to reconsider the application of the entire controversy doctrine to parties.  Previously, the entire controversy doctrine had served to preclude later prosecution of *claims* between the same parties if the claims could have been joined in prior proceedings between the parties.  *Wm. Blanchard Co. v. Beach Concrete Co., Inc.* 150 *N.J.Super.* 277,

---

[2] *Mortgagelinq I* had by then been concluded by settlements or default judgments against most of the named defendants.

292–93, 375 *A*.2d 675 (App.Div.), *certif. denied,* 75 *N.J.* 528, 384 *A*.2d 507 (1977). In *Crispin, supra,* we recognized the many difficult problems posed by the extension of the doctrine to parties. We noted: "We will proceed on a step-by-step basis recognizing that the doctrine is one of judicial fairness and will be invoked in that spirit." *Crispin, supra,* 96 *N.J.* at 343, 476 *A*.2d 250.

In *Cogdell v. Hospital Center at Orange,* 116 *N.J.* 7, 560 *A*.2d 1169 (1989), we took the next step and established a mandatory party-joinder rule similar to the mandatory claim-joinder rule. We noted that "consistent with the entire controversy doctrine, justice requires that it be applied only prospectively and to all cases not already on appeal." *Id.* at 28, 560 *A*.2d 1169. As a result of the holding in *Cogdell,* we promulgated *Rule* 4:30A, which became effective on September 4, 1990. That rule provides:

> Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by R. 4:64–5 (foreclosure actions) and R. 4:67–4(a) (leave required for counterclaims or cross-claims in summary actions).

Had *Mortgagelinq I* and *Mortgagelinq II* been brought successively in New Jersey courts, there would be little doubt that application of the entire controversy doctrine would preclude the omitted claims. The issue is whether the non-joinder of parties in a related action in the Pennsylvania federal court results in the same party preclusion in New Jersey. If so, what is the effect of that preclusion in other jurisdictions?

Heretofore our joinder rules have been understood to apply when claims have been omitted from proceedings in another jurisdiction. *See Giudice v. Drew Chem. Corp.,* 210 *N.J.Super.* 32, 509 *A*.2d 200 (App.Div.) (precluding, under entire controversy doctrine, claims that could have been brought in related New York proceedings), *certif. granted and summarily remanded on other grounds,* 104 *N.J.* 465, 517 *A*.2d 448, 449 (1986). And failure to join parties in an in-state federal court action would preclude later state court proceedings against the omitted parties. *Gross v.*

*Cohen DuFour & Assocs.,* 273 *N.J.Super.* 617, 642 *A.*2d 1074 (Law Div.1993). The precedential value of *Kimmins Abatement Corp. v. Conestoga–Rovers & Assocs., Inc.,* 253 *N.J.Super.* 162, 601 *A.*2d 256 (Law Div.1991) (holding that entire controversy doctrine did not bar second lawsuit against defendant who was not party to first lawsuit in another state), is clouded by speculation concerning the issue of personal jurisdiction in Colorado over the defendants omitted from the proceedings there. In *Mortgagelinq II,* as in *Giudice, supra,* and *Gross, supra,* New Jersey's goals are served by precluding claimants from bringing an action against a party that could have been joined in an earlier action brought elsewhere. The issue is whether it is fair to do so. One aspect of that review is consideration of whether a trial court, confronted in the earlier action with an entire controversy application, "would clearly have found grounds to excuse joinder." *DiTrolio, supra,* 142 *N.J.* at 274–275, 662 *A.*2d 494. That analysis presumes that the omitted parties could have been subject to the jurisdiction of the other forum.

■ We believe that the Pennsylvania federal court would not have severed the New Jersey defendants had there been a timely effort to join them. Further, any later claim that joinder would have been inappropriate is weakened by plaintiffs' failure to give the trial court the opportunity to make such a determination. Excusable neglect "attributable to an honest mistake that is compatible with due diligence or reasonable prudence," *Mancini v. EDS,* 132 *N.J.* 330, 335, 625 *A.*2d 484 (1993), is not present in this case. Plaintiffs are represented by sophisticated attorneys; there is no evidence of unfairness to a litigant attributable to such attorney neglect. Of course, this does not mean that the Pennsylvania federal court must follow our views of party joinder.

One of the underpinnings of the entire controversy doctrine, in addition to fairness to the parties, is fairness to the system of judicial administration. "Judicial economy and efficiency—the avoidance of waste and delay—remain constants in the application of the entire controversy doctrine. Fragmented and multiple

litigation takes its toll on not only the parties but the judicial institution and the public." *Cogdell, supra,* 116 *N.J.* at 23, 560 *A.*2d 1169. Each jurisdiction is free to assess the importance of such values. Our own Committee on Civil Practice recently recommended that the Court reconsider the principles of the entire controversy doctrine because it was not convinced that the doctrine necessarily produced judicial efficiency. The Committee was concerned that in some instances the doctrine would produce inefficiencies in the conduct of complex litigation. *1994 Report of the Supreme Court Comm. on Civil Practice,* 136 *N.J.L.J.* 581, 589 (Supp. Feb. 14, 1994). Hence, the entire controversy doctrine is hardly one of either uniform application or universal acceptance.

If Pennsylvania courts do not have a comparable party-joinder rule, principles of comity suggest that New Jersey should not seek to export its entire controversy doctrine to regulate the conduct of attorneys in that jurisdiction. In other words, attorneys conducting litigation in Pennsylvania courts should not have to accommodate their practices to the demands of New Jersey courts. A corollary of that proposition, however, is that New Jersey courts need not necessarily grant relief when parties deliberately refrain from seeking relief in other jurisdictions when doing so would have been much fairer to all parties involved. There is a delicate balance between the interests of the two jurisdictions that must accommodate the interests of justice. "The Rules of Practice are not an end unto themselves, but a means of serving the ends of justice." *Viviano v. CBS, Inc.,* 101 *N.J.* 538, 550–51, 503 *A.*2d 296 (1986).

### III

The best way to reconcile those interests is to understand what our interests are, and what the foreign jurisdiction's interests may be. In two recent cases, *Watkins v. Resorts International Hotel & Casino, Inc.,* 124 *N.J.* 398, 591 *A.*2d 592 (1991), and *Velasquez v. Franz,* 123 *N.J.* 498, 589 *A.*2d 143 (1991), we examined the interrelationship and preclusive effect of federal court judgments

in state court proceedings. Because the federal courts are considered those of another sovereign, *State v. Minter*, 116 *N.J.* 269, 279, 561 *A.*2d 570 (1989), those cases will also serve to guide us in cases involving proceedings in other states.

We restate a few of the basic principles set forth in *Watkins* and *Velasquez*. Issue preclusion is an aspect of the doctrine of *res judicata*. "The term '*res judicata*' refers broadly to the common-law doctrine barring relitigation of claims or issues that have already been adjudicated." *Velasquez, supra,* 123 *N.J.* at 505, 589 *A.*2d 143.[3]

> For a judicial decision to be accorded *res judicata* effect, it must be a valid and final adjudication on the merits of the claim. * * *
>
> Typically, the merits of a claim are adjudicated following a full trial of the substantive issues. * * *
>
> Increasingly, however, statutes, rules and court decisions operate to bar retrial of judgments that do not pass directly on the substance of a claim. * * *
>
> A judgment of involuntary dismissal or a dismissal with prejudice constitutes an adjudication on the merits "as fully and completely as if the order had been entered after trial."
>
> [*Id.* at 506–07, 589 *A.*2d 143 (quoting *Gambocz v. Yelencsics*, 468 *F.*2d 837 (3d Cir.1972)).]

"In general, the binding effect of a judgment is determined by the law of the jurisdiction that rendered it." *Watkins, supra,* 124 *N.J.* at 411, 591 *A.*2d 592 (citing *Restatement (Second) of Conflict of Laws*, § 95 comment e (1971)).

Our *Rule* 4:37–2(a) now labels every dismissal for failure to comply with a rule or order as "without prejudice unless otherwise specified in the order." By contrast, under *Federal Rule of Civil Procedure* 41(b) every such dismissal operates as an adjudication on the merits unless the court specifies otherwise or unless the dismissal is "for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19." "As construed by the United States Supreme Court, adjudications not on the merits

---

[3] Although party preclusion is not an exact fit for application of principles of *res judicata* (usually the parties must be the same for *res judicata* to apply), the concepts are similar.

under *Rule* 41(b) include 'those dismissals which are based on a plaintiff's failure to comply with a precondition requisite to [a] [c]ourt's going forward to determine the merits of his [or her] substantive claim.'" *Watkins, supra,* 124 *N.J.* at 417, 591 *A.2d* 592 (quoting *Costello v. United States,* 365 *U.S.* 265, 285, 81 *S.Ct.* 534, 545, 5 *L.Ed.2d* 551, 564 (1961)).

In *Watkins,* we stated that "a federal dismissal constitutes an adjudication on the merits unless the court specifies otherwise or the dismissal is based on a threshold issue concerning the court's ability to proceed to determine the substantive merits of the claim." *Ibid.* We held that standing is a threshold issue that eschews evaluation of the merits and, accordingly, we did not give preclusive effect to a federal dismissal for lack of standing. *Id.* at 417–18, 591 *A.2d* 592. On the other hand, in *Velasquez, supra,* 123 *N.J.* at 508–11, 589 *A.2d* 143, we found that a dismissal for lack of capacity to be sued constituted a judgment on the merits. Because the binding effect of a judgment is determined primarily by the jurisdiction that entered it, we must, in this context of federalism, consider what effect should be given to *Rule* 4:30A in this case.

We believe that the better analogy is to *Watkins,* and conclude that a dismissal for failure to comply with the entire controversy doctrine is more similar to a threshold adjudication than to an adjudication on the merits of the claim. That does not mean that a successive New Jersey action may be brought, because, barring any change in circumstances, the threshold bar would remain in place and be as effective as a final adjudication for purposes of any further New Jersey proceedings. However, our threshold is not a barrier elsewhere.[4]

---

[4] We note that if the first forum had a compulsory party-joinder rule, under choice-of-law principles, the second forum might be obliged to regard the claims against omitted parties as barred. For example, in a diversity action brought in U.S. District Court in New Jersey against parties omitted from a prior state court action in New Jersey, the claims against the omitted parties might be barred.

In *Watkins, supra*, 124 *N.J.* at 410, 591 *A.*2d 592, we noted the philosophy underlying our decision:

> Just as cohesion between state courts is necessary for national unity, cohesion between state and federal courts is necessary for the continuing vitality of the federalist system. Maintaining a cohesive federal system requires not only that federal courts honor state court judgments as mandated by 28 *U.S.C.* § 1738, but also that state courts honor federal court judgments.

Maintaining a cohesive federal system (and the Full Faith and Credit Clause melds the state courts into that system) does not require that the other parts of the federal system honor our entire controversy doctrine. There is a powerful federal interest in the vindication of the rights of a federally-created mortgage-lending agency. We assume that the federal court will carefully consider the vindication of that interest. That court may adhere to its previously expressed views concerning the preclusive effect of the *Mortgagelinq I* proceeding. We thus do no disservice to our dissenting members' concerns about the interests of comity and properly allowing the federal court to determine the *res judicata* effect of its earlier judgment. Our Rules of Practice are "a means of serving the ends of justice." *Viviano, supra*, 101 *N.J.* at 551, 503 *A.*2d 296.

The judgment of the Appellate Division is affirmed insofar as it applies the entire controversy doctrine to bar the successive actions in New Jersey under the present circumstances. The judgment is reversed insofar as it dismissed the complaints with prejudice.

POLLOCK, J., dissenting.

I respectfully submit that the majority has reached the wrong result for the wrong reason. Confronted with allegations of a massive fraud, the majority has barred the defrauded parties from seeking redress in the courts of this State. To achieve this untoward result, the majority extends unduly New Jersey's entire-

---

*Cf. Byrd v. Blue Ridge Rural Elec. Coop.*, 356 *U.S.* 525, 78 *S.Ct.* 893, 2 *L.Ed.*2d 953 (1958) (requiring certain state procedures to be followed in diversity case).

controversy doctrine to determine the preclusive effect of a judgment rendered by a federal court in another state. I dissent.

Because this matter arises on the grant of defendants' motion for summary judgment. The Court correctly accepts plaintiffs' statement of the facts and give plaintiffs the benefit of all favorable inferences that flow from those facts. *Judson v. Peoples Bank & Trust Co.*, 17 *N.J.* 67, 75, 110 *A.2d* 24 (1954). So viewed, defendants are either title companies or settlement clerks employed by the title companies who participated in defrauding plaintiffs of several million dollars. In a suit in the United States District Court for the Eastern District of Pennsylvania, plaintiffs recovered a judgment against the principal perpetrators. The issue here is whether plaintiffs' recovery of a judgment against those defendants should preclude plaintiffs from suing the present defendants in the state courts of New Jersey.

Under established choice-of-law principles, the preclusive effect of a judgment is determined by the law of the jurisdiction that rendered it. *Watkins v. Resorts Int'l Hotel & Casino, Inc.*, 124 *N.J.* 398, 411, 591 *A.2d* 592 (1991); *see also Restatement (Second) of Conflict of Laws* § 95 (1971) ("What issues are determined by a valid judgment is determined, subject to constitutional limitations, by the local law of the State where the judgment was rendered."); *Restatement (Second) of Judgments* § 86 (1982) ("A valid and final judgment of a state court has the same effects under the rules of res judicata in a subsequent action in a federal court that the judgment has by the law of the state in which the judgment was rendered...."); *Restatement (Second) of Judgments* § 87 (1982) ("Federal law determines the effects under the rules of res judicata of a judgment of a federal court."). "If [a] plaintiff would be precluded from maintaining ... a second action in the [jurisdiction] of rendition, he will similarly be barred from maintaining such an action in other [jurisdictions]." *Restatement (Second) of Conflict of Laws* § 95 comment e (1971). Federal law would not preclude plaintiffs from maintaining an action against

these defendants in federal courts. Consequently, I would not bar plaintiffs from pursuing the defendants in the courts of this State.

## I

The entire-controversy doctrine proceeds from significant policy considerations, including judicial efficiency and fairness to litigants. *Cogdell v. Hospital Ctr. at Orange,* 116 *N.J.* 7, 15, 560 *A.2d* 1169 (1989). Like other legal doctrines, however, the entire-controversy doctrine has its limits. For me, today's decision exceeds those limits.

To comprehend the reach of the majority's decision, it may help to compare briefly New Jersey's entire-controversy doctrine with claim preclusion elsewhere. New Jersey's approach to claim preclusion, as embodied in the entire-controversy doctrine, is unique. *See generally* Kevin Haverty, Note, *The Entire Controversy Doctrine in New Jersey and the Nominal Party Exception: When is the Entire Controversy Not the Entire Controversy?,* 23 *Rutgers L.J.* 341, 344–45 (1992) (explaining that source of doctrine is 1947 New Jersey Constitution); William J. Volonte, Comment, *The Entire Controversy Doctrine: A Novel Approach to Judicial Efficiency,* 12 *Seton Hall L.Rev.* 260, 260 (1982) (providing a historical overview of the development of "an unusual procedural rule called the 'entire controversy doctrine' "). No other jurisdiction has adopted so strict a rule on claims joinder. *See Arthur F. Greenbaum, Jacks or Better to Open: Procedural Limitations on Co–Party and Third–Party Claims,* 74 *Minn.L.Rev.* 507, 562 n. 233 (1990) ("New York provides a model of a permissive joinder approach to multi-claim litigation, while New Jersey takes a compulsory joinder approach. The Federal Rules approach falls between the two.") (citation omitted). *Compare Fed.R.Civ.P.* 13(a) (compulsory counterclaims) *with Fed.R.Civ.P.* 13(b) (permissive counterclaims) *and Fed.R.Civ.P.* 13(g) (permissive cross-claims).

Our mandatory party-joinder rule, which deviates significantly from the party-joinder practice in other jurisdictions, is not well-

known outside our State. *Cf.* Richard D. Freer, *Avoiding Dupli-cative Litigation: Rethinking Plaintiff Autonomy and the Court's Role in Defining the Litigative Unit,* 50 *U.Pitt.L.Rev.* 809, 837, 841–51 (1989) (recommending adoption of a mandatory party-joinder rule); John C. McCoid, *A Single Package for Multiparty Disputes,* 28 *Stan.L.Rev.* 707, 724–28 (1976) (same). The majority recognizes as much: "[T]he entire controversy doctrine can hardly be thought to be a doctrine of either uniform application or universal acceptance." *Ante* at 345, 662 *A.*2d at 541.

Even in New Jersey, the compulsory party-joinder rule has attracted critics. Last year, the Civil Practice Committee pro-posed the elimination of mandatory party joinder from the entire-controversy rule. The committee "concluded that despite the conceptual appeal of the [entire controversy] rule, it has, as a matter of practice, created many more difficulties than it has resolved. *1994 Report of the Supreme Court Comm. on Civil Practice,* 136 *N.J.L.J.* 581, 589 (Supp. Feb. 14, 1994).

Mandatory party joinder under the Federal Rules of Civil Procedure is less restrictive than under the New Jersey rules. Under the Federal Rules, a plaintiff has more discretion to structure the litigation and to choose which of a multiplicity of defendants to sue. *See Fed.R.Civ.P.* 20(a) (permissive joinder of all persons asserting, or defending against, joint, several, or alternative right to relief that arises out of same transaction or occurrence and presents common question of law or fact). For example, to preserve complete diversity, a plaintiff may elect to sue some, but not all, conceivable defendants. That election does not foreclose a plaintiff from bringing a subsequent action against defendants not named in the first lawsuit.

The Pennsylvania Federal District Court ruled in the action against the principal perpetrators that plaintiffs need not join the present defendants. The federal rules do not preclude plaintiff from bringing a second action against defendants not a party to the first action. Hence, plaintiffs could have filed a subsequent

action against the present defendants in the federal courts. New Jersey likewise should allow plaintiffs to maintain such an action.

Moreover, even if the Federal District Court had dismissed plaintiffs' original suit for failure to join defendants as necessary parties, the federal rules would not preclude plaintiffs from bringing a subsequent action against defendants. Under *Federal Rule of Civil Procedure* 19(a), certain defendants must be joined if feasible. Rule 19(a), however, applies only if: (1) failure to join the absentee party would prevent complete relief from being accorded among the present parties to the action; or (2) the absentee party claims an interest relating to the subject matter of the action and is so situated that his or her absence from the action (i) will have a prejudicial effect on his or her ability to protect his or her interest, or (ii) will subject any of the persons already parties to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations.

If, for example, joinder is not feasible because of lack of personal jurisdiction over the absent party, the federal court must "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being regarded as indispensable." *Fed. R.Civ.P.* 19(b). Significantly, *Federal Rule of Civil Procedure* 41(b) provides:

> Unless the court in its order of dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, *other than a dismissal* for lack of jurisdiction, for improper venue, or *for failure to join a party under Rule 19*, operates as an adjudication on the merits.
>
> [Emphasis added.]

Because a dismissal for failure to join a necessary or indispensable party is not an adjudication on the merits, such a dismissal has no preclusive effect. *See, e.g., Federated Dep't Stores, Inc. v. Moitie*, 452 *U.S.* 394, 398, 101 *S.Ct.* 2424, 2428, 69 *L.Ed.*2d 103, 108 (1981) (enumerating the three elements of *res judicata* as (1) same parties from earlier suit or their privies, (2) same cause of action as earlier suit, and (3) a valid final judgment on the merits in the earlier suit). In short, under the federal rules, a plaintiff whose

case has been dismissed for nonjoinder of an indispensable party may reinstitute suit. It follows that plaintiffs, who recovered a judgment in their first action, should not be in a worse position than a plaintiff whose case was dismissed. In sum, I believe that the majority, by looking to New Jersey's entire-controversy doctrine rather than applicable federal law, has erred.

## II

I also believe that the majority has reached the wrong result. The polestar of the entire-controversy doctrine is judicial fairness. *Reno Auto Sales, Inc. v. Prospect Park Sav. & Loan Ass'n,* 243 *N.J.Super.* 624, 630, 581 *A.2d* 109 (App.Div.1990); *see also Cogdell, supra,* 116 *N.J.* at 27, 560 *A.2d* 1169 (" '[T]he doctrine is one of judicial fairness and will be invoked in that spirit.' ") (quoting *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 343, 476 *A.2d* 250 (1984)). Distracted by a misplaced perception of judicial efficiency, the majority has, I believe, lost sight of the equities. As Justice Cardozo warned, "[a] system of procedure is perverted from its proper function when it multiplies impediments to justice without the warrant of clear necessity." *Reed v. Allen,* 286 *U.S.* 191, 209, 52 *S.Ct.* 532, 537, 76 *L.Ed.* 1054, 1062 (1932) (Cardozo, J., joined by Brandeis and Stone, JJ., dissenting); *cf. also Federated Dep't Stores, supra,* 452 *U.S.* at 403, 101 *S.Ct.* at 2430, 69 *L.Ed.*2d at 111 (Blackmun, J., concurring) (stressing that preclusion doctrine should be tempered by "overriding concerns of public policy and simple justice") (citations omitted); *Schum v. Bailey,* 578 *F.*2d 493, 506 (3d Cir.1978) (Gibbons, J., concurring) (explaining that a court must depart from "strict adherence to finality" when fraudulent misrepresentation induced claimant to litigate first in forum with less favorable choice-of-law rules); *Velasquez v. Franz,* 123 *N.J.* 498, 539, 542, 589 *A.2d* 143 (1991) (Stein, J., dissenting) (urging pragmatic approach towards *res judicata* and positing that public interest occasionally necessitates relaxation of preclusion rules); 1B *James W. Moore et al., Moore's Federal Practice* ¶ 0.405[12] (2d ed.1992) (suggesting that *res judicata* doctrine may

be subject to equitable tempering if rigid application will produce demonstrably incorrect result).

I fail to see the fairness in preventing defrauded plaintiffs from pursuing just claims against wrongdoers in the courts of this State. It strikes me as manifestly unfair to permit swindlers to escape liability merely because plaintiffs' counsel did not appreciate that the failure to join defendants in the earlier federal action would preclude plaintiffs from maintaining a subsequent suit in the courts of this State.

Notwithstanding the majority's assertion to the contrary, *ante* at 338, 662 *A*.2d at 537, the necessary implication of its holding is to export the entire-controversy doctrine to another jurisdiction. As a result of the majority's newly-announced rule, litigants everywhere must join all conceivable parties or forfeit access to the New Jersey courts.

The Third Circuit has recognized the problems that could be caused by extraterritorial application of New Jersey's entire-controversy doctrine when confronting a similar issue. *Electro–Miniatures Corp. v. Wendon Co.*, 889 *F*.2d 41, 45 (3d Cir.1989). Writing for a unanimous panel, Judge A. Leon Higginbotham observed:

> We note at least the theoretical possibility that such a holding [applying the entire controversy doctrine extraterritorially] might compel careful litigators in other jurisdictions to raise all related claims and issues and seek all available remedies in a single proceeding, because of the possibility that a subsequent claim might arise in New Jersey. In this way, New Jersey would be imposing on litigants and courts in other states its policy choice to encourage parties to litigate all claims, defenses, issues, and remedies related to a particular transaction.
>
> [*Id.* at 45 n. 6.]

I am persuaded that permitting plaintiffs to proceed is not unfair to defendants and will not pose an undue burden on the New Jersey courts.

Implicitly recognizing the inequity of barring plaintiffs' claim, the majority suggests that the federal courts should "carefully consider the vindication of" plaintiffs' rights. *Ante* at 348, 662 *A*.2d at 542. Although the majority precludes plaintiffs from

suing in the state courts, it leaves them free to pursue a second action in the federal courts. To achieve this result, the majority characterizes a state court dismissal based on the entire-controversy doctrine as one without prejudice. *Id.* at 346, 347, 662 *A.*2d at 541, 542. Yet, the majority recognizes that in the state courts the dismissal, in effect, will be preclusive. *Id.* at 347, 662 *A.*2d at 542. Ironically, the majority reaches the opposite conclusion when construing the effect of the federal court judgment. The majority, which finds that the first federal court judgment precludes the present action, accords the first federal court judgment greater preclusive effect than would the federal courts.

Like the majority, I believe that fairness and judicial economy undergird the entire-controversy doctrine. From my perspective, however, the majority opinion fails to serve either purpose. I do not see the fairness of preventing defrauded plaintiffs from maintaining an action in New Jersey merely because their counsel, while pursuing a Pennsylvania federal court action, did not follow the New Jersey *Rules of Practice.* Furthermore, requiring plaintiffs to pursue a second federal court action is inefficient. The fair and efficient solution, in my view, is to permit the state court action to proceed.

For these reasons, I would reverse the judgment of the Appellate Division and remand the matter to the Law Division.

Justice STEIN joins in this dissent.

*For affirmance in part and reversal in part* —Justices HANDLER, O'HERN, GARIBALDI and COLEMAN—4.

*For reversal and remandment* —Justices POLLOCK and STEIN—2.