41 N.J. Super. 135 (1956)
124 A.2d 328
JOSEPH STAMEN, PLAINTIFF-RESPONDENT,
v.
METROPOLITAN LIFE INSURANCE COMPANY, ETC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued July 2, 1956.
Decided July 26, 1956.
*136 Before Judges GOLDMANN, BURTON and SULLIVAN.
Mr. Nicholas Conover English argued the cause for appellant (Messrs. McCarter, English & Studer, attorneys).
Mr. Harry Schaffer argued the cause for respondent (Mr. Louis M. Drazin, attorney).
*137 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff brought this action to recover monthly disability benefits allegedly due him under a life insurance policy issued by defendant company. Defendant counterclaimed for reformation of the policy so as to eliminate the provisions for such payments, on the ground of mutual mistake or, alternatively, mistake on its part and fraud on plaintiff's. Disability was conceded. The pretrial order provided that since the issues arising under the counterclaim sounded in equity, they should be tried and determined by the court sitting without a jury. Such a trial was held and resulted in a judgment dismissing the counterclaim and awarding plaintiff recovery of disability benefits less a sum representing the deficiency in total premiums, with interest thereon, properly due defendant.
The history of the policy in suit merits detailing. On February 28, 1930 plaintiff made written application to defendant for a $5,000 "10-year renewable term" life insurance policy. The company decided that he was not eligible for such insurance, and instead issued policy No. 6 262 287A, dated March 10, 1930, under its "endowment at age 85" plan. Thereafter plaintiff, on March 28, executed an application amendment changing the requested plan of insurance to "Endowment at Age 85," in order to make the policy as issued conform with the written application. Neither the original application nor the application amendment, copies of which were annexed to and made part of the original policy, contained any request for disability benefits  either waiver of premiums or payment of monthly income in the event of total and permanent disability  and no premium for any kind of disability coverage was charged. Plaintiff accepted delivery of the policy on or about March 28, 1930 and thereafter retained it.
Five years later, on February 20, 1935, plaintiff applied to defendant to change his policy from "Endowment Age 85" to "Endowment Age 85 Disability Provision Waiver of Premium only, the rewritten policy to bear original date," and surrendered the policy for appropriate action. Defendant *138 acted favorably upon the written request. The annual premium was increased by $3.60, from $93.20 to $96.80, and a rider on Form 1088, providing only for waiver of premiums in the event of total and permanent disability, was attached to the policy. Plaintiff thereupon on March 30, 1935 signed an application amendment, a copy of which was attached to and made part of the policy, requesting the indicated change in insurance plan. The policy, with Form 1088 attached, was delivered to and retained by him.
Plaintiff initiated yet another change on March 7, 1941, when he signed an application, a copy of which is attached to and made part of the policy, to change the plan from "Endowment at Age 85 with Disability Waiver" to "Whole Life with Disability Waiver, the rewritten policy to bear original date." At that time he surrendered his policy for reissue in accordance with the request. A clerk in the Change Division of defendant's home office calculated the revised annual premium at $86.50 (the premium on the main policy was reduced from $93.20 to $83.20 and the premium for disability waiver of premiums from $3.60 to $3.30), and gave written instructions for a rider on Form 1088 to be attached to the rewritten policy. The application and other papers were then sent to the Policy Division for preparation of a new policy under the requested whole life plan. A clerk there crossed out the instructions for a Form 1088 rider by substituting "988" for "1088." His action was not in accordance with the company practice nor with plaintiff's application.
The request for a change of plan necessitated the preparation of a new policy on a form appropriate for the whole life plan. Consequently, the reissued policy was a different instrument, the original policy subsequently being destroyed by defendant after being retained some three years, in accordance with its routine practice. The new policy had the same number as the original and, as requested by plaintiff, bore the original date of issue, March 10, 1930. Attached was a rider on Form 988, which provided for not only waiver of premiums but also monthly income in the event of total *139 and permanent disability. It should be noted that defendant had discontinued selling insurance under Form 988 in November 1931. The inclusion of the form was clearly a mistake on the part of defendant's employees. The rewritten policy was in due course delivered to plaintiff who accepted it and has since retained it. In accordance with its practice, defendant kept no carbon copy of either the policy as originally issued in 1930 or of the reissued policy prepared in 1941.
It is undisputed that plaintiff never paid the premium chargeable for monthly income in addition to waiver of premiums in the event of total and permanent disability. Defendant's records show that the premium charged for the disability rider between 1935 and 1941 was $3.60, and after the policy was reissued in May 1941, $3.30. The correct premiums would have been $16.30 and $16.10, respectively, during those two periods. Nor is it disputed that it was not until November 18, 1953 that plaintiff first notified defendant that the rewritten policy delivered to him in May 1941 contained a rider providing for monthly income payments in the event of total and permanent disability.
Defendant suggests, "not as a ground for reversal, but for securing enlightenment for the Bar and for the trial bench as to the proper policy to be followed in administering R.R. 4:41-3," that at the pretrial conference the Law Division judge should have on his own motion transferred the action to the Chancery Division. The issues, it is said, were then sufficiently narrowed, so that the only litigated ones remaining were those involving the counterclaim for reformation; and that although the action had thus become "a 100% Simon-pure equity case" the court declined to transfer on its own motion when invited to do so. Defendant claims that the disadvantages resulting were, first, unnecessary expense and delay occasioned by waiting for the case to be reached for trial and, second, prejudice to its rights because it was "deprived of trial before a judge who was a specialist in equity matters."
*140 The suggestion that we render an advisory opinion on R.R. 4:41-3 is completely without merit in view of (1) defendant's admission that the court's action was correct and not a ground for reversal under R.R. 4:40-2 and 4:41-3; (2) its express stipulation, set out in the pretrial order, that the matter be heard by the court without a jury; and (3) the fact that the question has been fully settled. The Supreme Court and this court have both held that Art. VI, Sec. III, pars. 3 and 4 of the 1947 Constitution provide generally for the expeditious handling of all matters in controversy at one time and place, and require, where possible, complete determination of a controversy by the court which first properly obtains jurisdiction over the subject matter. O'Neill v. Vreeland, 6 N.J. 158 (1951); Tumarkin v. Friedman, 17 N.J. Super. 20 (App. Div. 1951), certification denied 9 N.J. 287 (1952); Garrou v. Teaneck Tryon Co., 11 N.J. 294 (1953); Asbestos Fibres, Inc., v. Martin Laboratories, Inc., 12 N.J. 233 (1953); In re Opper's Estate, 29 N.J. Super. 520 (App. Div. 1954).
Equity will grant reformation of an insurance policy where there is mutual mistake or where a mistake on the part of one party is accompanied by fraud or other unconscionable conduct of the other party. Heake v. Atlantic Casualty Ins. Co., 15 N.J. 475, 481 (1954); Volker v. Connecticut Fire Ins. Co., 22 N.J. Super. 314, 321 (App. Div. 1952); Koch v. Commonwealth Ins. Co. of New York, 87 N.J. Eq. 90, 93-94 (Ch. 1917), affirmed o.b., 88 N.J. Eq. 344 (E. & A. 1917).
Our courts have long held that a party seeking reformation must establish his right to relief by proof that is clear and convincing. Among the many cases we may note Graham v. Berryman, 19 N.J. Eq. 29 (Ch. 1868), reversed sub nom. Berryman v. Graham, 21 N.J. Eq. 370 (E. & A. 1869); Rowley v. Flannelly, 30 N.J. Eq. 612 (Ch. 1879); First National Bank of Town of Union v. Fessler, 84 N.J. Eq. 166 (E. & A. 1915); By-Fi Building & Loan Association v. New York Casualty Co., 116 N.J. Eq. 265 (Ch. 1934); Ehnes v. Monroe Loan Society, 120 N.J. *141 Eq. 599 (E. & A. 1936); Laytham v. Mann, 120 N.J. Eq. 563 (Ch. 1936); Asbestos Fibres, Inc., v. Martin Laboratories, Inc., above; Millhurst Milling & Drying Co. v. Automobile Ins. Co., 31 N.J. Super. 424 (App. Div. 1954). And see 2 Restatement of the Law of Contracts, § 511, p. 981.
R.R. 1:5-4(b) and 2:5 authorize an appellate court, on a review of any civil cause involving issues of fact not determined by the verdict of a jury, to make new or amended findings of fact, due regard being given to the opportunity of the trial court to judge of the credibility of the witnesses. The exercise of such power when the interests of justice require it is demonstrated in such cases as Sun Dial Corp. v. Rideout, 25 N.J. Super. 591 (Ch. Div. 1953), reversed 29 N.J. Super. 361 (App. Div. 1954), affirmed 16 N.J. 252 (1954); Pratico v. Rhodes, 32 N.J. Super. 178 (App. Div. 1954), reversed 17 N.J. 328 (1955); City of Asbury Park v. Department of Civil Service, 17 N.J. 419 (1955); Borough of Park Ridge v. Salimone, 21 N.J. 28 (1956); State v. Taylor, 38 N.J. Super. 6 (1955).
The only witness in defense of the counterclaim for reformation was plaintiff himself. His story, in a sentence, is that in February 1930 he spoke to defendant's agent Stengle about purchasing a $5,000 policy providing for waiver of premiums and monthly benefits in case of total and permanent disability, and that this is the policy he thought he had all along. Stengle was not available as a witness, having died. Plaintiff admitted having examined the policy. In denying reformation the trial court said it believed plaintiff's story, and found as a fact that there was no mutual mistake, or mistake on defendant's part with fraud or unconscionable conduct on plaintiff's part.
Plaintiff's testimony, particularly on cross-examination, was vague, insubstantial and unconvincing. He remembered little about the circumstances touching the issuance of the original policy or the changes subsequently effected therein. His answers to questions were punctuated with "I don't remember," "I don't recall." He returned repeatedly to the generalized explanation that he had always been under the *142 "impression" that he had disability benefit payments coverage; he "assumed" that he had it. He said he had requested this type of policy because only a month before he had obtained one from the Prudential Insurance Company. It is to be noted, however, that the application for the Prudential policy asked for, and the policy provided, a modified life insurance plan with accidental death benefits and a 90-day disability income. Not one of the applications for the Metropolitan policy requested monthly disability benefits.
Plaintiff carried three other policies in the defendant company. The history of these policies is not without significance. They had been issued in 1923, 1927 and 1928, respectively, without disability benefit provisions of any kind. By March 1935 all three policies had been changed to an endowment-at-age-85 plan. In that month, and at the very time when plaintiff asked the company to change the policy in suit from an endowment at age 85 to "Endowment Age 85 Disability Provision Waiver of Premium only, the rewritten policy to bear original date," he signed application amendments for the other three policies requesting precisely the same change. The change was made and a Form 1088 rider attached to each policy. Plaintiff admits that the change in these three policies was a correct fulfillment of his request.
On May 7, 1941, when plaintiff made written application to have the policy in suit changed to a whole life policy with disability waiver of premiums, he also applied for an identical change in one of the other three policies just mentioned. Pursuant to such request defendant reissued the latter policy with a Form 1088 rider attached, which plaintiff admitted was a correct fulfillment of his written application. This policy was processed by the same clerk in defendant's Change Division as handled the one before us.
The policy here in question states that it and the application therefor "constitute the entire contract between the parties * * *." See N.J.S.A. 17:34-15(c). At the time of making his original application and the several application amendments, plaintiff knew that he could not *143 enter into a contract with an agent which would be binding upon the insurance company, for on the application form itself, a copy of which is attached and made a part of the policy, he stated immediately above his signature that he "understood and agreed" that "the Company shall incur no liability under this policy until it has been received, approved, and a policy issued and delivered * * *." And he knew that the agent with whom he held the alleged conversation was without power to bind defendant by any statement he might make regarding the coverage to be afforded, for another section of the application form stated that it was also understood and agreed that "no agent * * * have power on behalf of the Company: (a) to make, modify or discharge any contract of insurance; (b) to bind the Company by making any promises respecting any benefits under any policy issued hereunder."
The written application and application amendments are the best evidence of plaintiff's intention. What he asked for therein is far more persuasive as to what his intention was than the unsatisfactory account given a quarter of a century after the policy was written and when the insurance agent was dead, and many years after the last written application for a change. In no place in his testimony could plaintiff give a convincing explanation as to why the applications read as they did. At one place, when asked whether there was anything in writing which would show that he had asked for monthly disability payments he replied: "I know I signed for it. It is like everything else; lots of times it's filled in. From what you got there, it isn't there." At another place he was asked whether what he had requested in his Prudential policy application was not different from that requested in his application for the policy in suit, insofar as disability benefits were concerned, and his answer was: "Well, the only difference with some of these agents, you know, some are better than others."
We agree with defendant that the only competent source of plaintiff's intention is to be found in his successive written applications for insurance. These show that he never *144 asked for monthly income in the event of disability, but that he first asked in 1935 for disability waiver of premiums only. (This was five years after the policy was issued  five years during which there is no proof that the policy carried a disability rider of any sort whatsoever.) He repeated the request for disability waiver only in 1941 when he wanted to change his life insurance coverage from endowment at age 85 to the whole life plan. In short, he never manifested an intention to obtain the benefits provided by a Form 988 rider. And he never paid the larger premium that would be charged for monthly benefit payments.
We consider it significant that plaintiff not only accepted but looked at and retained the original policy as well as the one that was redelivered to him following the addition of the Form 1088 rider in 1935. He did the same when the policy was reissued on a different plan in 1941. He remained silent all that time and until 1953, and now explains his silence by flatly stating that he "understood," "was under the impression," or "assumed" that he had a policy with monthly disability benefits from the start.
We consider that plaintiff's credibility was successfully attacked and effectively destroyed, not because his testimony differed from that of some other witness, but because it was in complete conflict with his written applications for the coverage in question and is irreconcilable with the course he pursued in identical situations respecting his other three policies with defendant, described above. Under the circumstances, we do not accord the usual significance to the fact that the trial court had an opportunity to observe plaintiff's demeanor on the witness stand.
The testimony of a witness may be rejected even though not directly contradicted by another witness, "when it is contrary to circumstances given in evidence or contains inherent improbabilities or contradictions which alone or in connection with other circumstances in evidence excite suspicion as to its truth." In re Perrone's Estate, 5 N.J. 514, 521-522 (1950). Chief Justice Vanderbilt there said that
*145 "* * * Testimony to be believed must not only proceed from the mouth of a credible witness but must be credible in itself. It must be such as the common experience and observation of mankind can approve as probable in the circumstances."
And see Pratico v. Rhodes, above, 17 N.J., at page 335; State v. Taylor, above, 38 N.J. Super., at page 24; Jensen v. Wilhelms Construction Co., 18 N.J. Super. 372, 378 (App. Div. 1952); Gilson v. Gilson, 116 N.J. Eq. 556, 560 (E. & A. 1934); and for an early expression of the Perrone principle, Daggers v. Van Dyck, 37 N.J. Eq. 130, 132-133 (Ch. 1883).
We are convinced that plaintiff never applied for a policy providing for monthly disability benefits or requested a change in policy which would have achieved that end. His position is not unlike that of the defendant in Columbian National Life Ins. Co. v. Black, 35 F.2d 571, 71 A.L.R. 128 (10 Cir. 1929), who had applied for a life insurance policy on the ordinary life plan. By mistake the insurance company used the form for an endowment policy, so that defendant received a policy with larger cash options at the end of 20 years than were provided for by the premium which he had paid for a policy on the ordinary life plan. The District Court denied reformation; in reversing and directing reformation the Circuit Court of Appeals said:
"* * * It is true the defendant on the stand and in his letters denies any mistake on his part. But his actions speak louder than his words. He applied for an ordinary life policy; without any quibble, and in response to his application, he received a policy that manifestly was in error. He only paid for an ordinary life policy. When he received the policy he either did or did not notice the error. If he did not notice it, the mistake was mutual. If he did notice it and said nothing, he was guilty of such inequitable conduct as to amount to fraud. A man presents a check for $100 to a bank teller; he gets two $100 bills. No matter how loudly he asserts the lack of mistake on his part, the fact still remains that he was either mistaken or was trying to benefit by the teller's mistake. Without resorting to any oral evidence, the papers in this case on their face bear conclusive proof of a mistake that can be and should be corrected in equity." (35 F.2d, at page 574)
*146 Cf. Flimin's Adm'x v. Metropolitan Life Ins. Co., 255 Ky. 621, 75 S.W.2d 207 (Ct. App. 1934); Metropolitan Life Ins. Co. v. Oseas, 261 App. Div. 768, 27 N.Y.S.2d 65 (App. Div. 1941), affirmed 289 N.Y. 731, 46 N.E.2d 348 (Ct. App. 1942). On all the evidence, defendant has clearly and convincingly established a case for reformation based upon mutual mistake, or at least mistake on the part of defendant accompanied by the inequitable conduct of plaintiff.
The judgment is reversed.