**Albert F. ESOLDI & Diana Esoldi, Plaintiffs,**

v.

**David ESOLDI, et al., Defendants.**

**Civ. No. 92–5190 (WGB).**

United States District Court,
D. New Jersey.

April 9, 1996.

Orbe, Nugent and Darcy by John F. Darcy, Lisbeth Cload, Ridgewood, NJ, for Plaintiffs.

Orloff, Lowenbach, Stifelman & Siegel, P.A. by Michael S. Haratz, Roseland, NJ, for Defendants David Esoldi, David J. Esoldi, Albert Esoldi, Squawbrook Builders, Inc., Squawbrook Run Associates, Franklin Hill Associates, Franklin Hill Builders, Inc., Esoldi Development Corp., David Esoldi & Sons, Inc., and Esoldi Management Corp.

Williams, Caliri, Miller & Otley by Cheryl H. Burstein, Wayne, NJ, for Defendant Resolution Trust Corporation as Receiver for Polifly Savings and Loan Association, Polifly Federal Savings and Loan Association, and Chalder Investment Corp.

Hellring Lindeman Goldstein & Siegal by James A. Scarpone, John A. Adler, Newark, NJ, for National Union Fire Insurance Company.

Harwood Lloyd by Frank Holohan, Hackensack, NJ, for Theodore Van Dam, Gregg Van Dam, and Marion Van Dam.

Tompkins, McGuire & Wachenfeld by Thoedore L. Abeles, Brian M. English, William H. Trousdale, Newark, NJ, for David Van Dam and Hartmann, Brooks, Van Dam & Sinisi.

Mr. and Mrs. Rico Pagliei, Bayville, NJ, pro se.

## OPINION

BASSLER, District Judge:

This litigation involves claims arising out of an alleged partnership agreement between two brothers. The plaintiff and his wife, Chuck and Diana Esoldi, allege that Chuck's brother, David Esoldi, in conjunction with the other defendants, misappropriated funds and business opportunities of partnerships in which Chuck Esoldi had an interest. Two of the defendants are a law firm, Hartmann, Brooks, Van Dam & Sinisi ("Hartmann Brooks") and one of its partners, David Van Dam. This opinion resolves a counterclaim by Hartmann Brooks' insurer for reformation of Hartmann Brooks' professional liability insurance policy based on misrepresentations by David Van Dam in the insurance application.[1]

National Union Fire Insurance Company ("National Union") was the professional liability insurer for Hartmann Brooks.[2] National Union alleges that David Van Dam made a material misrepresentation on the firm's insurance application for the policy that became effective March 28, 1990. In response to a question on the renewal application David Van Dam indicated that he was not aware of any circumstances that could lead to a claim against the firm or any one of the partners. National Union contends that David Van Dam was aware of circumstances that could give rise to a claim on November 8, 1989 and during the period before the policy became effective.

Hartmann Brooks also requested an increase in coverage in the new policy from $2

---

1. The court incorporates the "Background" section of its opinion filed December 20, 1995 for a description of plaintiffs' claims.

2. The plaintiffs named National Union as a direct defendant in their Third Amendment to the Verified Complaint filed September 13, 1993. The Third Amendment was a declaratory judgment action. Plaintiffs' counsel represented at trial that the declaratory judgment action has been resolved. 4–3–96 Tr. at 3–4. The court notes, however, that counsel did not address one issue in the declaratory judgment action, namely whether National Union's payment of the claim pursuant to the settlement agreement in the PS & L action was a "claim made in the policy period March 28, 1990—March 28, 1991." The court assumes that this issue has also been resolved. If it has not, counsel must notify the court by April 15th at which time the court will set a supplemental briefing schedule.

million per claim and $3 million aggregate to $5 million per claim and $5 million aggregate. Based on David Van Dam's alleged material misrepresentation on the application and his failure to correct that information before the new policy became effective, National Union filed a counterclaim to reform the insurance policy to its prior limits of $2 million per claim and $3 million aggregate. The court bifurcated National Union's counterclaim from plaintiff's claims. See Opinion of Magistrate Judge Cavanaugh filed March 9, 1995.

Plaintiffs object to both the legal remedy of reformation and the factual basis for it. Plaintiffs contend that David Van Dam answered the question honestly, and thus, his answer is not a basis to reform the contract. They argue that rescission, not reformation, is the appropriate remedy and that the defendants have waived their right to either remedy. Even if the remedy is available, the plaintiffs argue that coverage can not be reformed as to the other partners of the firm because they are "innocent insureds." Finally, plaintiffs contend that this action is barred by the entire controversy doctrine.

This court has jurisdiction over this portion of the trial pursuant to 28 U.S.C. § 1367.

The matter came before the court for trial without a jury. The court heard testimony on April 3rd and 4th, 1996 and held closing arguments on April 8, 1996.

The court concludes that National Union is entitled to reformation of the insurance contract to its prior coverage limits of $2 million per claim and $3 million aggregate.

## I.  FINDINGS OF FACT[3]

### A.  Hartmann Brooks' Insurance Policy

National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") is an insurance company whose business includes the issuance of policies of professional liability insurance.

At all times relevant hereto, defendant Hartmann, Brooks, Van Dam & Sinisi, formerly Hartmann, Brooks & Van Dam ("Hartmann Brooks"), was a New Jersey law

firm of which Robert K. Hartmann and defendant David Van Dam were partners.

National Union insured Hartmann Brooks for several years prior to 1990 with the policy year commencing on March 28th of each year under professional liability policy number LPL–1674018. Prior to March 28, 1990, the limits of the Hartmann Brooks policy were $2,000,000 per claim and $3,000,000 annual aggregate.

Hartmann Brooks applied for a renewal of the policy for the year starting March 28, 1990 by way of an application signed by David Van Dam and dated November 8, 1989. Def.Exh. 1. Question 14 of the Renewal Application read as follows:

> Is the firm aware of any circumstances, or any allegations or contentions as to any incident which may result in any claim being made against the firm or any of its past or present Owners, Partners, Shareholders, Corporate Officers or Employees or its predecessors in business?

David Van Dam answered that question in the negative. The application included the following statement:

> I/we hereby declare that the above statements and particulars are true and I/we have not suppressed or misstated any material facts, and I/we agree that this application shall be the basis of the contract with the Company.

In December of 1989, Hartmann Brooks added five new attorneys to the firm. As a result of the merger, Hartmann Brooks' bookkeeper, Carol Sue Campbell, requested that National Union increase the firm's policy limits from $2 million per claim and $3 million aggregate. Def.Exh. 6. The policy was renewed by National Union with increased policy limits of $5 million per claim and $5 million annual aggregate. Endorsement No. 2 to the policy, dated February 12, 1990, reflects the increased limits of $5 million/$5 million.

---

**3.** To the extent any of the findings of fact constitute conclusions of law, the court expressly adopts them as such. Conversely, to the extent that any conclusions of law constitute findings of fact, the court adopts them as such.

## B. David Van Dam's Knowledge

David Van Dam was aware of acts that could lead to a claim against the firm in November of 1989 when he submitted the insurance application. David Van Dam also became aware of other circumstances that could lead to claims against the firm prior to the effective date of the new policy.

### 1. Pre–Application Acts

At the time he signed the insurance application, David Van Dam was aware of at least two circumstances that could expose the firm to liability. First, David Van Dam knew that he had made a misrepresentation to Polifly Savings & Loan ("PS & L") regarding his partner Robert Hartmann's interest in one of the entities to which PS & L loaned money.

Hartmann Brooks acted as associate counsel to PS & L from July 1984 until March 6, 1990. Robert Hartmann served as a director of Polifly Savings and Loan ("PS & L") from 1973 until March 6, 1990. Because Hartmann was a director of PS & L, PS & L was barred by federal banking regulations from loaning more than $100,000 to any entity in which Hartmann or a member of Hartmann's family had an interest. David Van Dam was aware of this prohibition.

Nevertheless, Hartmann possessed an interest in Changebridge East, Inc., a company that PS & L loaned $26,000,000. Changebridge East was a New Jersey corporation that owned real estate in Montville, New Jersey which it intended to develop into townhouses and single family homes.

In October, 1986 PS & L asked Changebridge for a list of its shareholders. At the time, David Van Dam represented Changebridge. He responded to PS & L's request in an October 30, 1986 letter in which he falsely indicated that the only shareholders in Changebridge were himself and two other individuals. David Van Dam intentionally did not list Hartmann or Hartmann's wife as shareholders, even though Hartmann owned 24 shares that he had placed in his wife's maiden name. On May 23, 1993, David Van Dam pled guilty to making a false statement to a federally insured financial institution and

obstruction of justice based on this misrepresentation.

At the time David Van Dam signed the insurance application, he was aware of this misrepresentation. He knew that he had a legal and ethical obligation to disclose Hartmann's interest and was aware that if PS & L knew about Hartmann's interest it could not make the loan to Changebridge. 4–3–96 Tr. at 154–55. David Van Dam also knew that Changebridge was a problem loan, and knew that he could be subject to liability for his misrepresentation.

In addition to misrepresenting Hartmann's interest in Changebridge, David Van Dam was also aware that he had engaged in a "questionable" transaction regarding David Esoldi's purchase of a unit located at the Northgate condominium complex ("Unit 39"). The Northgate complex was owned by Northgate Associates, a limited partnership in which the limited partner was Chalder Investment Corp., a wholly owned subsidiary of PS & L, and the general partner was North Hedge Builders, Inc., a corporation in which Chuck Esoldi was a shareholder, director and the corporate secretary.

Chuck Esoldi told David Van Dam that he refused to sign a deed from Northgate Associates to David Esoldi for Northgate Unit 39 before there was an accounting. David Van Dam had his legal secretary sign the deed in April, 1989, as assistant secretary of North Hedge Builders. After the secretary executed the deed David Van Dam delayed recording the deed in order to satisfy Chuck Esoldi's desire to have an accounting before the deed was executed. 4–3–96 Tr. at 75.

David Esoldi secured a loan from PS & L for the purchase of Unit 39 prior to the execution of the deed by David Van Dam's secretary. David Van Dam gave PS & L a mortgage signed by David Esoldi, certified that PS & L had a first lien on the property, and recorded the mortgage before his secretary signed the deed. At the time, he knew that recording the mortgage before recording the deed was "questionable." 4–3–96 Tr. at 161.

David Van Dam ultimately recorded the deed sometime after Chuck Esoldi filed this

action. David Van Dam was aware of the lawsuit but did not consult with Chuck Esoldi before recording the deed. Although David Van Dam credibly testified that he did not think of this transaction as the basis for a lawsuit, he knew that it was "questionable." *Id.* at 76. He admits that if he didn't know that a claim could be made against him based on the Unit 39 transaction, he should have known. *Id.* at 162.

David Van Dam admits that "in retrospect, there's no question" that he was aware of circumstances that could result in a claim being made against him or the firm when he signed the insurance application. 4-3-96 Tr. at 165.

### 2. David Van Dam's Knowledge Before the Effective Date of the Policy

David Van Dam also became aware of additional information that could lead to a claim against Hartmann Brooks or himself between executing the insurance application in November 1989 and the effective date of the policy, March 28, 1990.

On March 6, 1990, PS & L terminated Hartmann Brooks as counsel pursuant to a consent agreement with the Office of Thrift Supervision.

On March 22, 1990 plaintiffs' counsel took David Van Dam's deposition. David Van Dam's attorney requested that his deposition be continued on another date because David Van Dam believed that the line of questioning was "an area that could potentially expose him to personal liability." 4-3-96 Tr. at 69.

Despite these events, David Van Dam did not notify National Union before the effective date of the policy of any potential claims.

### 3. National Union's Actions

In March of 1991 National Union declined to renew the Hartmann Brooks policy. Pursuant to discussions between Hartmann Brooks and National Union, National Union extended the policy to April 1991 and Hartmann Brooks purchased a six-year extended reporting privilege.

On June 25, 1991 PS & L filed suit in this court against Hartmann Brooks and its part-ners, including David Van Dam. The complaint alleged that Hartmann Brooks and David Van Dam had engaged in improper activities as counsel for PS & L. On August 23, 1991 PS & L filed a separate suit in the Superior Court of New Jersey against its former general counsel and its accountants. PS & L subsequently dismissed its federal action and joined Hartmann Brooks and David Van Dam as defendants in the state court action.

In response to the PS & L suit, National Union filed a declaratory judgment action against Hartmann Brooks in the Superior Court of New Jersey on August 14, 1992. National Union sought to rescind or reform Hartmann Brooks insurance policy because Hartmann Brooks allegedly procured the renewal of the policy and increase in the limits through fraud. National Union also sought a declaration that Hartmann Brooks' conduct identified by PS & L was excluded from coverage under the policy. PS & L made a motion to intervene which was granted in September, 1992.

In November, 1992, the parties reached a settlement agreement resolving both the declaratory judgment action and PS & L's suit. Pursuant to the settlement, the Hartmann Brooks policy was reformed to its prior limits of $2 million per claim and $3 million aggregate and National Union paid PS & L $2 million in satisfaction of its claims. The Esoldi plaintiffs did not intervene in the lawsuit and did not participate in the settlement, thus, the reformation is not effective as to their claims. National Union did, however, expressly reserve the right to contest any future claim on the policy, including the claim of the Esoldi plaintiffs. In October, 1993 National Union filed its counterclaim for reformation in the *Esoldi* action.

## II. CONCLUSIONS OF LAW

■ The court concludes that National Union has established by clear and convincing evidence that it is entitled to reformation of the insurance policy from limits of $5 million per claim and $5 million aggregate to the prior policy limits of $2 million per claim and $3 million aggregate.

■ "Equity will grant reformation of an insurance policy where there is mutual mistake or where a mistake on the part of one party is accompanied by fraud or other unconscionable conduct of the other party." *Stamen v. Metropolitan Life Insurance Co.*, 41 N.J.Super. 135, 140, 124 A.2d 328 (App. Div.1956). "[T]he fact that the mistake was induced or contributed to in some way by the other party is generally sufficient to justify reformation." Couch on Insurance 3d at sec. 27:10. The standard of proof is clear and convincing evidence. *St. Pius X House of Retreats v. Camden Diocese*, 88 N.J. 571, 580–81, 443 A.2d 1052 (1982).

■ Fraud in the equitable sense differs from fraud in the legal sense because it does not require proof of scienter. As the New Jersey Supreme Court recently explained:

> A misrepresentation amounting to legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment. The elements of scienter, that is, knowledge of the falsity and an intention to obtain an undue advantage therefrom, are not essential if plaintiff seeks to prove that a misrepresentation constituted only equitable fraud. Thus 'whatever would be fraudulent at law will be so in equity; but the equitable doctrine goes farther and includes instances of fraudulent misrepresentations which do not exist in the law.'

*Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 609, 560 A.2d 655 (1989). "Both [rescission and reformation] are available remedies in an action for equitable fraud." *Id.* at 611, 560 A.2d 655. Thus, it is not necessary for National Union to establish that David Van Dam had an intent to defraud.

The court concludes that David Van Dam's answer to question 14 on the insurance application constituted equitable fraud. David Van Dam credibly testified that he did not intend to defraud National Union, however, David Van Dam was objectively aware of several circumstances that could produce claims at the time he signed the application. He admits that with hindsight, "there's no question" that he was aware of circumstances that could result in a claim being made against him or the firm. 4–3–96 Tr. at 165.

National Union has demonstrated by clear and convincing evidence that David Van Dam's answer to question 14 was material to its decision to increase the policy limits. Herbert L. Jamison & Co., LLC ("Jamison") is the administrator of National Union's Lawyers Professional Liability Insurance Program in New Jersey. Joseph Bieniowski, a vice-president of the professional services division of Jamison credibly testified that if a "clean" application comes in, Jamison has the authority to increase the policy limits to a specified level without consulting with National Union. A clean application is one that indicates there are no circumstances that could give rise to a claim.

In contrast, if an application identifies potential claims, Jamison is required to transfer the application to a National Union underwriter for approval. Thus, if David Van Dam had answered yes to question 14, Jamison would have transferred the application to National Union for approval. Patricia Stack, one of National Union's senior underwriters, credibly testified that if David Van Dam had responded to question 14 by identifying the circumstances regarding Changebridge and the Unit 39 transaction, she would not have authorized the increase. 4–4–96 Tr. at 8–9.

National Union has established by clear and convincing evidence that it committed a mistake regarding the risk of its insured and that its mistake was induced by the material misrepresentation of David Van Dam. Consequently, National Union is entitled to reformation of the insurance policy from limits of $5 million per claim and $5 million aggregate to $2 million per claim and $3 million aggregate.

### A. Misrepresentation or Misunderstanding?

Plaintiffs argue that David Van Dam's answer was not a misrepresentation because the question related to his awareness of the actions of third parties' preparing to file a claim. Plaintiffs rely on *St. Paul Fire and Marine Ins. Co. v. Jacobson*, 826 F.Supp.

155, 158 (E.D.Va.1993) aff'd, 48 F.3d 778 (4th Cir.1995), in which the court determined that the defendant doctor had not made a material misrepresentation on an insurance application even though he did not disclose his illegal activities in response to a question about potential liability. The question at issue in *St. Paul* was: "Do you have knowledge of any pending claims or activities (including requests for medical records) that might give rise to a claim in the future?" The court held that a reasonable person would interpret the question to refer to pending claims and third party activities prior to filing a claim.

The question in *St. Paul* is markedly different than the question in the National Union application. Question 14 was: "Is the firm aware of any circumstances, or any allegations or contentions as to any incident which may result in any claim being made against the firm or any of its past or present Owners, Partners, Shareholders, Corporate Officers or Employees or its predecessors in business?" This court concludes that "[t]he meaning of the provision is clear to the reasonable reader, regardless of hidden 'ambiguities' that can be unearthed by grammatical digging." *Longobardi v. Chubb Ins. Co. of New Jersey*, 121 N.J. 530, 543, 582 A.2d 1257 (N.J.1990). Question 14 clearly refers to events that could give rise to a claim, not strictly third parties' manifested intentions to pursue a claim.

### B. Availability of the Reformation Remedy

■ Plaintiffs argue that reformation is only available where the misrepresentation concerns the contents or effect of an instrument, and does not apply where the misrepresentation induces a party to enter the contract. Plaintiffs are correct that the *Esoldi* situation is not the classic reformation case in which the parties' written agreement fails to reflect the understanding of the parties at the time of contracting. *See e.g., Parrette v. Citizens' Casualty Co.*, 128 N.J.Eq. 206, 15 A.2d 802 (E & A 1940). Here, both parties understood that the contract increased the policy limits to $5 million per claim and $5 million aggregate.

Although the traditional reformation case involves an agreement that is different than what the parties intended, recent cases reflect an expansion of the doctrine to allow reformation in situations where one party enters into an agreement on certain terms based on a mistake of fact induced by the other party's misrepresentation. In *Weinisch v. Sawyer*, 123 N.J. 333, 587 A.2d 615 (1991) for example, the court held that "when an insured sues the insurer and its agent for the agent's failure to inform the insured of available coverage, the proper remedy is reformation." *Id.* at 336, 587 A.2d 615. Weinisch contended that Allstate and its agent did not inform plaintiff of the option to purchase higher limits of unisured/underinsured ("UM/UIM") motorist coverage. The UM/UIM coverage on his policy was the statutory minimum. He sought to "recover the amount he would be due if the policy had contained higher UM/UIM limits." *Id.* at 341–342, 587 A.2d 615. The court concluded that the relief requested was reformation, and calling it by any other name was "merely wordplay." *Id.* at 342, 587 A.2d 615. If reformation is available in New Jersey to increase the limits of a policy, the court does not see why it is not available to decrease limits where there is equitable fraud.

Other jurisdictions have allowed reformation based on a mistake regarding an external fact. Kansas courts, for example "have entertained the use of reformation where a party mistakenly enters into a written contract on certain terms because of the other party's misrepresentations of material fact." *Inter–Americas Ins. Corp., Inc. v. Xycor Systems, Inc.*, 757 F.Supp. 1213, 1221 (D.Kan.1991). In *Inter–Americas*, the court denied a motion to dismiss plaintiff's reformation claim where plaintiff asserted that it would not have agreed to limitation of remedy or disclaimer clauses if it had known that the defendant had misrepresented the accuracy and reliability of its product.

Similarly, in *Monarch Ins. Co. of Ohio v. Lankard*, 715 F.Supp. 304 (D.Kan.1989), the court granted reformation of an insurance contract to include the insured's wife as a co-insured. The plaintiff issued an insurance policy on an aircraft based on the insured's

representation that he was the sole owner of the plane. The insured subsequently crashed the plane, killing himself and his wife. The policy required the plaintiff to defend claims, except claims by co-insureds. The court granted reformation of the policy to name the wife as a co-insured in order to relieve the insurance company of its obligation to defend the husband's estate against the wife's estate's claim.

The Second Circuit Court of Appeals has also applied the doctrine to mistakes that would have changed the parties' bargain. In *National Am. Corp. v. Federal Republic of Nigeria*, 597 F.2d 314 (2d Cir.1979), the court upheld reformation of a settlement agreement. The parties had agreed to pay demurrages for twelve ships in a Nigerian harbor but only six ships were actually in the harbor. The court reduced the amount of the demurrages in the agreement to reflect that only six ships were actually in the harbor. The court reasoned that the parties intended the ships in the harbor to be covered and either were mutually mistaken or fraudulently induced to believe that twelve ships were present. Although the court did not expressly expand the doctrine, Judge Van Graafeiland noted in dissent that because the parties intended to cover all twelve ships, the settlement accurately reflected their agreement and traditional reformation was not available. *Id.* at 326.

In light of the New Jersey Supreme Court's discussion in *Weinisch* and the expansive cases from other jurisdictions, the court concludes that reformation is available to National Union. Adopting the plaintiffs' argument that an insurer's only remedy in fraudulent inducement cases is rescission would punish National Union for seeking a less drastic remedy. It defies common sense and offends equitable principles to deny an insurer who could seek rescission the right to instead perform the contract and simply seek reformation of the policy limits.

There is no New Jersey law that prevents this court from exercising its equitable discretion to use reformation as the appropriate remedy. "[T]he court of equity has the power of devising its remedy and shaping it to fit the changing circumstances of every case and the complex relations of all the parties. A lack of precedent, or mere novelty in incident is no obstacle to the award of equitable relief ..." *Roach v. Margulies*, 42 N.J.Super. 243, 246, 126 A.2d 45 (App.Div.1956), quoting *Sears, Roebuck & Co. v. Camp*, 124 N.J.Eq. 403, 411, 1 A.2d 425 (E & A 1938) (internal citations omitted).

### C. Delay in Asserting the Remedy

█ Plaintiffs argue that even if the remedy of reformation is available to National Union, National Union waived its right to reform. Plaintiffs contend that National Union was aware of facts that alerted it to the misrepresentation on September 9, 1990 when Hartmann Brooks notified National Union of the Esoldi claim but did not assert its counterclaim for reformation until October 1993. Plaintiffs argue that National Union was under a duty to diligently investigate whether it had a basis for reformation and to reform the contract within a reasonable time.

Plaintiffs have not produced any evidence that the *Esoldi* complaint was sufficient to notify National Union of David Van Dam's material misrepresentation on the insurance application. Furthermore, National Union expressly reserved its rights under the policy when it agreed to defend Hartmann Brooks in the *Esoldi* and *PS & L* actions. The reservation of rights letters issued by National Union preserve National Union's option to reform the contract despite the fact that it assumed Hartmann Brooks' defense. *See Merchants Indem. Corp. v. Eggleston*, 37 N.J. 114, 179 A.2d 505 (1962).

█ Even if National Union's delay was unreasonable, plaintiffs are barred from raising waiver or estoppel. The rights of a third party claimant derive from the rights of the insured. *See Tal v. Franklin Mut. Ins. Co.*, 172 N.J.Super. 112, 117, 410 A.2d 1194 (App. Div.) cert. denied, 85 N.J. 103, 425 A.2d 267 (1980). "Waiver and estoppel apply when the insured is deceived or misled to his detriment, not when an insured invokes waiver and estoppel in order to make his fraud effective." *Schrader v. Prudential Ins. Co.*, 280 F.2d 355, 364 (5th Cir.1960). Hartmann Brooks can not assert waiver or estoppel in

order to make David Van Dam's misrepresentation effective; consequently, plaintiffs are also barred from raising these arguments.

### D. The Effect of the Reformation on Innocent Insureds

■ Plaintiffs argue that under the terms of the policy, the reformation does not apply to the innocent partners who were unaware of David Van Dam's fraudulent misrepresentation. Section V of the policy provides:

V. Innocent Insured

Whenever coverage under this policy would be excluded, suspended, or lost

(a) *because of any exclusion* relating to criminal, dishonest, fraudulent or malicious acts, errors or omissions by any insured, and with respect to which any other insured did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof, and

(b) *because of noncompliance with any condition* relating to the giving of notice to the Company with respect to which any other insured shall be in default solely because of the default or concealment of such default by one or more insureds responsible for the loss or damage hereunder;

the Company agrees that such insurance as would otherwise be afforded under this policy shall cover and be paid with respect to each and every insured who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of one or more of the acts, errors, or omissions described in any such exclusion; provided that if the condition be one with which such insured can comply, after receiving knowledge thereof, the insured entitled to the benefit of this Condition V shall comply with such condition promptly after obtaining knowledge of the failure of any other insured to comply therewith.

With respect to this provision, the Company's obligation to pay in such event shall be in excess of the deductible and in excess of the full extent of any assets of any insured to whom the exclusion applies. (emphasis added)

Plaintiffs argue that this provision expressly prohibits reducing coverage to the innocent insureds. The language in Section V relates solely to loss of coverage based on exclusions or conditions and not to the right of the insurance company to rescind or reform the policy. The provision does not prevent National Union from reforming coverage as to the innocent insureds based on a misrepresentation in the insurance application. *See, e.g. Mazur v. Gaudet*, 826 F.Supp. 188 (E.D.La.1992) (innocent insured clause did not bar rescission).

The plaintiffs also argue that under New Jersey law, insurance companies must provide explicit notice to innocent insureds that they can lose coverage based upon the misrepresentations of a co-insured. They cite *Longobardi v. Chubb Ins. Co. of New Jersey*, 121 N.J. 530, 582 A.2d 1257 (1990), in support of this proposition. The court in *Longobardi* held that a provision in an insurance policy denying coverage for any insured who makes a material misrepresentation applies to postloss misrepresentations as well as misrepresentations in the insurance application. *Longobardi* does not stand for the proposition that the policy must contain a provision clearly indicating that coverage is voided by the misrepresentation of any insured.

In addition to *Longobardi*, plaintiffs also rely on a line of New Jersey fire insurance cases to support their argument that reformation must not apply to innocent insureds. Plaintiffs correctly indicate that the "innocent insured" concept arose in the context of fire insurance litigation as a judicial response to the inequity of barring an innocent spouse from recovering insurance proceeds after a culpable spouse had intentionally set fire to the marital property. In *Howell v. Ohio Casualty Insurance Co.*, 130 N.J.Super. 350, 327 A.2d 240 (App.Div.1974), the court held that absent an express provision in the insurance policy to the contrary, the parties intend that the innocent spouse be entitled to full recovery. In the *Howell* case, however, the fraud occurred after the insurance policy went into effect. The husband's act was excluded from coverage under the policy.

Here, in contrast, the misrepresentation occurred at the inception of the policy.

■ When an insured obtains insurance through misrepresentations, the policy may be reformed as to all insureds. *See Shapiro v. Am. Home Assurance Co.*, 584 F.Supp. 1245 (D.Mass.1984). In *Shapiro*, the Massachusetts District Court held that misrepresentations made by the officer of a corporation in application for an insurance policy invalidated the policy as to all insureds, innocent and otherwise. The court reasoned that since the officer "misrepresented the risk incurred in insuring all those covered by the policy, it follows that American Home can avoid responsibility to all the insureds on the basis of that misrepresentation." *Id.*, at 1252. The court was also persuaded by the likelihood of joint and several liability "being imposed on all directors for the wrongdoing of one," because the misrepresentations were highly material to the liability of all other directors. *Id.*

The facts in *Esoldi* parallel *Shapiro*. First, the misrepresentations were made by one member of a law firm on behalf of the firms' other members. Second, the misrepresentations were made in the application for the insurance policy. Third, if one of the insureds is sued in their capacity as an attorney for Hartmann Brooks, all partners in the firm are equally liable.

Neither the insurance policy itself nor New Jersey law prohibit reducing coverage to innocent insureds when one insured makes a material misrepresentation on an insurance application. Thus, the reformation of the policy applies to all insureds.

### E. The Entire Controversy Doctrine

Plaintiffs' final argument is that the New Jersey entire controversy doctrine bars National Union from asserting its reformation claim. This court denied plaintiffs' motion for summary judgment premised on this ground in an opinion filed June 7, 1994. Plaintiffs assert that in light of several 1995 cases construing the doctrine, the prior decision is erroneous. The court concludes that the doctrine does not apply.

### 1. Standards Governing the Doctrine

■ "The New Jersey entire controversy doctrine is a particularly strict application of the rule against splitting a cause of action." *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 163 (3d Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). The fundamental principle behind the inclusion policy of the entire controversy doctrine is that the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy. *DiTrolio v. Antiles*, 142 N.J. 253, 267, 662 A.2d 494 (1995).

The doctrine precludes a plaintiff from litigating claims that were or could have been litigated in a prior proceeding and further bars claims against parties who should and could have been named in the prior proceeding. *Itzkoff v. F & G Realty of New Jersey, Corp.*, 890 F.Supp. 351, 355 (D.N.J.1995).

The entire controversy doctrine seeks to further goals of judicial economy and fairness by requiring, whenever possible, that adjudication of a legal controversy occur in one litigation before one court. *Circle Chevrolet v. Giordano, Halleran & Ciesla*, 142 N.J. 280, 289, 662 A.2d 509 (1995); *Kozyra v. Allen*, 973 F.2d 1110, 1111 (3d Cir.1992). The entire controversy doctrine applies to constituent claims that were known to the litigant during the pendency of a prior action, including accrued claims for accountant malpractice. *Circle Chevrolet*, 142 N.J. at 290, 294, 662 A.2d 509.

■ The objectives behind the doctrine are: (1) furthering the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency, the avoidance of waste, and the reduction of delay. *Circle Chevrolet*, 142 N.J. at 289–90, 662 A.2d 509 (citing *DiTrolio v. Antiles*, 142 N.J. 253, 267, 662 A.2d 494 (1995)). Application of the rule is discretionary. *Id.* at 290, 662 A.2d 509, though appellate review in the

federal courts of the application of state law is plenary. *Bennun,* 941 F.2d at 163.

The New Jersey courts have extended the preclusive effect of the entire controversy doctrine to all affirmative claims that a party might have against another party, including counterclaims and cross-claims. *Circle Chevrolet v. Giordano, Halleran & Ciesla,* 142 N.J. 280, 289, 662 A.2d 509 (1995).

Plaintiffs identify several recent New Jersey Supreme Court cases that address the scope and application of the entire controversy doctrine. *See DiTrolio v. Antiles,* 142 N.J. 253, 662 A.2d 494 (1995) (addressing the circumstances under which successive claims constitute one controversy for purposes of the doctrine); *Circle Chevrolet v. Giordano, Halleran & Ciesla,* 142 N.J. 280, 662 A.2d 509 (1995) (addressing scope of entire controversy doctrine rule of mandatory joinder in context of attorney malpractice claims); *Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.,* 142 N.J. 336, 662 A.2d 536 (1995) (addressing whether entire controversy doctrine has extraterritorial effect). The court concludes that even in light of these cases, the doctrine does not bar National Union's counterclaim.

■ In deciding whether an action is barred by the entire controversy doctrine, the Court must make three inquiries. First, the Court must determine whether the claims arise from related facts or the same transaction or series of transactions. *DiTrolio,* 142 N.J. at 267, 662 A.2d 494. Second, the Court must determine whether application of the doctrine would be fair to the parties. *DiTrolio,* 142 N.J. at 272–77, 662 A.2d 494; *Circle Chevrolet,* 142 N.J. at 309–10, 662 A.2d 509. Finally, the Court must consider whether application of the doctrine would promote judicial economy and efficiency by avoiding the waste and delay occasioned by piecemeal litigation. *DiTrolio,* 142 N.J. at 277, 662 A.2d 494.

### a. *Factual Congruence Between the Actions*

■ In determining whether a subsequent action is sufficiently inter-related to trigger application of the entire controversy doctrine, "the central consideration is whether the claims against the different parties arise from related facts or the same transaction or series of transactions." *DiTrolio v. Antiles,* 142 N.J. 253, 267, 662 A.2d 494 (1995). "It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be determined in one proceeding." *Id.* at 267–68, 662 A.2d 494.

■ In 1994, this court concluded that the National Union declaratory judgment action and the National Union counterclaim concerned different transactions. Opinion filed June 7, 1994. The court reasoned that the National Union lawsuit was based on Hartmann Brooks' actions as counsel for PS & L while the *Esoldi* counterclaim was based on Hartmann Brooks' actions as counsel for Chuck Esoldi. *Id.* at 10.

In light of the analysis in *DiTrolio,* however, the court concludes that the actions share the same core set of facts, namely the misrepresentations of David Van Dam in completing the insurance application. Nevertheless, the court concludes the dual purposes of the doctrine, fairness and judicial efficiency, would not be served by applying the doctrine to National Union's counterclaim.

### b. *Fairness*

■ The "polestar of the application of the rule is judicial 'fairness.'" *DiTrolio,* 142 N.J. at 272, 662 A.2d 494 (quoting *Reno Auto Sales, Inc. v. Prospect Park Sav. and Loan Ass'n,* 243 N.J.Super. 624, 630, 581 A.2d 109 (App.Div.1990)). Fairness in the application of the entire controversy doctrine focuses on the litigation posture of the respective parties and whether all of their claims could be most soundly and appropriately litigated and disposed of in a single adjudication. *Id.* at 277, 662 A.2d 494.

The inquiry focuses on fairness both to the party omitted from the first action and to the party bringing the second action. *Id.* at 272–73, 662 A.2d 494. With respect to the omitted party, the fairness inquiry asks whether defendants would be in a better position to defend themselves if the claims against them

had been raised and asserted in the first litigation. *Id.* at 273, 662 A.2d 494. Among other ways, a party may be prejudiced by exclusion from the discovery process in the prior litigation. *Id.* "Fairness is thus a protective concept that focuses primarily on whether defendants would be in ·a better position to defend themselves if the claims against them had been raised and asserted in the first litigation." *Id.*

■ Fairness to the plaintiff in the second action must also be considered by the Court. The chief consideration is whether "the party whose claim is being sought to be barred ... had a fair and reasonable opportunity to have fully litigated that claim in the original action." *Id.* (citing *Cafferata v. Peyser,* 251 N.J.Super. 256, 261, 597 A.2d 1101 (App.Div.1991)). Thus, the entire controversy doctrine does not bar claims that were unknown to the plaintiff or unaccrued during the pendency of the first action. *Id.* at 273–74, 662 A.2d 494. Nor does it bar claims when the first court lacked jurisdiction over the parties or the claims. *Itzkoff,* 890 F.Supp. at 358; *see Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.,* 142 N.J. 336, 338, 662 A.2d 536 (1995).

■ A derivative aspect to the fairness prong is whether it is fair to preclude the second litigation because the entire controversy doctrine was not followed. *DiTrolio,* 142 N.J. at 274, 662 A.2d 494. This aspect of the doctrine recognizes that the need for a single comprehensive adjudication may be outweighed by the complexity, confusion or unmanageability that might arise from joinder. *Id.* Generally, however, the determination of whether joinder would result in an overly-complex litigation should be made by the court in the first action, which is vested with discretion to sever or stay a given aspect of the controversy in light of administrative concerns. *Id.*

Finally, the entire controversy doctrine may be unfair to apply when it would punish the party for the excusable neglect of its counsel. *Id.* at 275, 662 A.2d 494.

Each fairness factor weighs against applying the doctrine to National Union's counterclaim. First, the plaintiffs have not identi-fied any prejudice as a result of National Union not naming them in the declaratory judgment action. In fact, the plaintiffs were aware of the declaratory judgment action and had the opportunity to intervene, but did not do so.

Second, it would be unfair to apply the doctrine to National Union's counterclaim when the court agreed with National Union in 1994 that the entire controversy doctrine as it then existed did not bar its counterclaim. Assuming that the counterclaim would be barred in light of the 1995 cases, National Union should not be penalized for its counsel's "excusable neglect" in failing to join the Esoldis in the prior action.

Furthermore, the doctrine is typically applied defensively in a second suit brought by the same plaintiff. National Union is a defendant in this action; it has not attempted to take a second bite at the apple, but has instead been brought to court by the plaintiff. It would be unfair to allow the plaintiff to use the doctrine offensively to bar National Union's counterclaims.

### c. *Efficiency*

■ The third factor in the entire controversy doctrine analysis is whether mandatory joinder is appropriate to further judicial economy and efficiency. *Id.* at 277, 662 A.2d 494. This inquiry focuses on how closely related the two lawsuits are, whether proof of the claims in the two suits would be duplicative, and how far the respective cases have or had proceeded in discovery. *Id.* at 277–78, 662 A.2d 494.

Mandatory joinder in this context would not promote judicial efficiency. If the doctrine required insurers to join every claimant in one declaratory judgment action, their ability to settle cases would be greatly reduced. Furthermore, the actions would become unwieldy because the doctrine would require each named claimant to join every defendant from its own case.

The court concludes that New Jersey would not apply the doctrine to bar National Union's counterclaims.

### III. *CONCLUSION*

The court reforms the Hartmann Brooks insurance policy effective March 28, 1990 from limits of $5 million per claim and $5 million aggregate to its prior limits of $2 million per claim and $3 million aggregate.