997 A.2d 1035 (2010)
414 N.J. Super. 97
ARCHBROOK LAGUNA, LLC, formerly known as BDI Laguna, Inc., Plaintiff-Appellant,
v.
Charles L. MARSH, Defendant/Third-Party Plaintiff-Respondent,
v.
Peter Castenfelt, Jay Wertheimer, Klaus Kirchberger and Peter Handy, Third-Party Defendants.
DOCKET NO. A-5254-08T3.
Superior Court of New Jersey, Appellate Division.
Argued March 3, 2010.
Decided June 17, 2010.
*1036 Thomas C. Goldstein (Akin, Gump, Strauss, Hauer & Feld) of the Washington, D.C. bar, admitted pro hac vice, argued the cause for appellant (Nicoll, Davis & Spinella, Paramus and Mr. Goldstein, attorneys; Mr. Goldstein, of counsel; Daniel F. McInnis (Akin, Gump, Strauss, Hauer & Feld) of the Washington, D.C. bar, admitted pro hac vice; Allison Walsh Sheedy (Akin, Gump, Strauss, Hauer & Feld) of the Washington, D.C. bar, admitted pro hac vice and Jack T. Spinella, on the brief).
Steven Hall (Baker, Donelson, Bearman, Caldwell & Berkowitz) of the Georgia bar, admitted pro hac vice, Atlanta, GA, argued the cause for respondent (Kraemer, Burns, Mytelka, Lovell & Kulka, Springfield, and Mr. Hall, attorneys; Mr. Hall and Wayne D. Greenfeder, Springfield, of counsel and on the brief).
Before Judges FISHER, SAPP-PETERSON and ESPINOSA.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we conclude that the trial judge correctly dismissed this action pursuant to the entire controversy doctrine because plaintiff failed to pursue the claims asserted here in an action previously pending in Georgia state court.
*1037 BDI Laguna, Inc. (BDIL) commenced this action against Charles L. Marsh, its former president and a resident of Georgia. This action was subsequently dismissed by way of summary judgment. Because the standards governing summary judgment entitle the motion's opponent to have the facts viewed in the light most favorable to it, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), we accept the description of the relationship of the various business entities contained in BDIL's pleadings.[1]
On April 13, 2004, more than three years before the suit at hand was commenced, Marsh filed a complaint in the Superior Court of Fulton County, Georgia, against BDIL. Marsh also asserted claims against Jay L. Wertheimer, who was alleged to have been the chief executive officer and primary shareholder of BDI Distributors, Inc., BDIL's predecessor, when in 1997 he approached Marsh and solicited him to abandon his business and accept a job with BDI Distributors, Inc. According to the Georgia complaint, Wertheimer enticed Marsh by offering him, among other things, the position of president with broad powers and a right to remain in Atlanta absent his express consent. In addition, Wertheimer allegedly promised Marsh that he would receive at least 8% and up to 15% of the stock of BDI Distributors, Inc. when it was sold, i.e., what the parties have referred to as the "commission promise." Marsh accepted. As the company grew, Marsh was allegedly promised an additional 2% of the company's stock ("the stock promise") in order to entice him to remain in the event of a merger. The Georgia suit commenced by Marsh asserted the breach of these two alleged promises.
In April 2006, BDIL filed a counterclaim against Marsh in the Georgia suit. The counterclaim's first two counts asserted that Marsh breached his fiduciary duty and committed fraud by abusing his expense account. The third and last count asserted that after Marsh was asked to explain his alleged expense account "indiscretions," Marsh filed the Georgia suit in retaliation; the counterclaim's third count also alleged that Marsh's complaint was frivolous and sought the fees, expenses and costs incurred by BDIL in defending the action.
*1038 On December 3, 2007, BDIL commenced the action in the Law Division, alleging that Marsh breached his fiduciary duties and committed fraud because he failed to tell BDIL about the commission promise, which was the subject of the Georgia action, and allowed BDIL to enter into an indemnification agreement with Wertheimer to protect Wertheimer against certain types of claims that might be asserted against him. BDIL alleged in its New Jersey complaint, after expressly referring to the Georgia action, that:
5. . . . Marsh fraudulently concealed this claim for substantial stock ownership against Wertheimer throughout his employment with BDIL. Moreover, Marsh concealed this potential claim from BDIL's management even when BDIL negotiated and entered into a 2003 Indemnification Agreement . . . with Wertheimer. Marsh was directly and personally involved in negotiating this agreement. The Indemnification Agreement contractually required BDIL to not only pay for any legal fees Wertheimer incurred, but also indemnify Wertheimer for judgment against him. Marsh's concealment from BDIL of his potential claim for the 8 to 15% interest against Wertheimer constitutes a breach of his fiduciary duty as a corporate officer under the laws of New Jersey and the State of Georgia . . . .
6. The Indemnification Agreement Marsh negotiated on behalf of BDIL with Wertheimer provided that the Company would indemnify Wertheimer in the event that claims were asserted against him and identified the categories of claims covered by the Indemnification Agreement. As an officer of BDIL, Marsh had a fiduciary duty to warn the company that he had a potential claim against Wertheimer which would trigger the company's indemnification obligations under the agreement. If Marsh had disclosed this potential claim against Wertheimer, BDIL would have removed disputes relating to that claim from the scope of the indemnity agreement or would have declined to enter into the Indemnification Agreement altogether. Marsh's failure to disclose this claim to BDIL constitutes a breach of his fiduciary duty to the Company and also constituted a fraud upon the Company.
7. Marsh's breach of his fiduciary obligation and fraud . . . has directly resulted in: (1) BDIL already incurring more than $700,000 in legal fees under the Indemnification Agreement; and (2) the possibility of additional legal fees and expenses if Marsh's claims filed in Georgia against Wertheimer continue to be prosecuted by Marsh.
On January 28, 2008, nearly two months after filing its New Jersey complaint, BDIL filed a stipulation dismissing its pending counterclaim in the Georgia action without prejudice.
At a case management conference in Georgia on March 19, 2008, Marsh urged the rapid scheduling of a trial date out of a concern he would be forced to litigate with BDIL on two separate fronts. At that time, Marsh's counsel argued that BDIL's counterclaims were compulsory, which the Georgia judge found was a question she need not answer. In addition, BDIL's counsel indicated that his client was "perfectly free to take the risk that [Marsh's counsel] may prevail in convincing somebody that this is a compulsory counterclaim after we have gotten to a final judgment" in Georgia.
The Georgia action was tried in June 2008. The trial judge granted a directed verdict in favor of Wertheimer on the so-called "commission promise" at the conclusion of Marsh's case-in-chief. The jury, however, found in favor of Marsh on his claims against BDIL, awarding $2,208,724; in ruling on a post-trial motion, the judge *1039 reduced that award to $1,577,660. The jury also found BDIL liable to Marsh for his attorney's fees, and the judge quantified that claim, awarding Marsh $400,000. Final judgment was entered as to all issues and all parties on October 28, 2008.
On December 18, 2008, Marsh moved for summary judgment in this action, seeking the dismissal of BDIL's complaint based on res judicata or the entire controversy doctrine. The motion was granted by way of a written opinion and order entered on January 23, 2009. A later motion for reconsideration was denied, and plaintiff filed this appeal.[2]
The application of the entire controversy doctrine is ultimately "one of judicial fairness and will be invoked in that spirit." Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 343, 476 A.2d 250 (1984). The doctrine was judicially created as a "reflection.. . of the unification of the state courts" in light of our Constitution's recognition of "the value in resolving related claims in one adjudication so that `all matters in controversy between parties may be completely determined.'" Mystic Isle Development Corp. v. Perskie & Nehmad, 142 N.J. 310, 322, 662 A.2d 523 (1995) (quoting N.J. Const. art. VI, § 3, ¶ 4). The objectives of the entire controversy doctrine are:
(1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, including both parties before the court as well as prospective parties; and (3) to promote judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation.
[Mystic Isle, supra, 142 N.J. at 322, 662 A.2d 523.]
In considering the doctrine's application, courts are guided by the general principle that all claims arising from a particular transaction or series of transactions should be joined in a single action. Brennan v. Orban, 145 N.J. 282, 290, 678 A.2d 667 (1996). That mandate encompasses not only matters actually litigated but also other aspects of a controversy that might have been litigated and thereby decided in an earlier action. Vision Mortg. Corp. v. Patricia J. Chiapperini, Inc., 307 N.J.Super. 48, 52, 704 A.2d 97 (App.Div.1998), aff'd, 156 N.J. 580, 722 A.2d 527 (1999). The doctrine does not, however, "apply to bar component claims that are unknown, unarisen, or unaccrued at the time of the original action." Mystic Isle, supra, 142 N.J. at 323, 662 A.2d 523. And it is also understood that the entire controversy doctrine should not be applied when "joinder would result in significant unfairness [to the litigants] or jeopardy to a clear presentation of the issues and just result." Cogdell v. Hospital Ctr. at Orange, 116 N.J. 7, 27, 560 A.2d 1169 (1989) (quoting Crispin, supra, 96 N.J. at 354-55, 476 A.2d 250).
In arguing that the entire controversy doctrine should not have been applied, BDIL contends that (1) its claims against Marsh did not arise out of the same transactional facts as those involved in the Georgia suit; (2) the New Jersey claims had not accrued at the time of the filing of responsive pleadings in Georgia; (3) the entire controversy doctrine does not apply when the other suit remains pending; and (4) if applied, dismissal should only have been without prejudice. We reject all these arguments.
*1040 First, as we have noted, the applicability of the entire controversy doctrine chiefly turns on whether the separately-asserted claims "arise from related facts or the same transaction or series of transactions." DiTrolio v. Antiles, 142 N.J. 253, 267, 662 A.2d 494 (1995). DiTrolio held that a test for determining whether a litigant should assert claims in a suit, rather than save them in reserve for a later suit, is whether "after final judgment is entered, [the parties will] likely ... have to engage in additional litigation to conclusively dispose of their respective bundles of rights and liabilities that derive from a single transaction or related series of transactions." Id. at 268, 662 A.2d 494.
The claims asserted by BDIL in both its Georgia counterclaim and its New Jersey complaint were based on theories that Marsh committed fraud or breached the fiduciary duty he owed to BDIL. Although it is arguable that BDIL's Georgia counterclaim asserted different allegations of fraud or misconduct than those asserted against Marsh in its New Jersey complaint, any distinctions are not of sufficient weight to deflect application of the entire controversy doctrine. The pivotal circumstance in both the Georgia action and this action is the "commission promise." In Georgia, Marsh urged enforcement of the "commission promise" in seeking damages against BDIL; here, BDIL asserted that Marsh's failure to disclose the "commission promise" to BDIL caused it to execute the indemnification agreement and later incur damages by defending Wertheimer as ostensibly required by the indemnification agreement. These claims certainly arose from the same transaction or series of transactions.
In short, application of DiTrolio's test to the present circumstances demonstrates that the claims BDIL withheld from the Georgia suit and pursued in this action were elements of "one mandatory unit of litigation." Ibid.
Second, BDIL's argument that the claims asserted in this action had not accrued by the close of the pleading stage in Georgia is wholly without merit. As Marsh persuasively argues, any damages that BDIL may have incurred if it could prove the allegations of its New Jersey complaint accrued no later than when Marsh filed suit in Georgia. As BDIL argued in the trial court in opposing Marsh's motion for summary judgment, "Marsh's decision to sue Wertheimer in Georgia in 2004 triggered [BDIL's] obligation to pay for Wertheimer's defense, thus causing damage to the Company to the tune of more than $900,000." In short, we find no merit in this aspect of BDIL's argument, because there is no doubt that the claims in question accrued years before BDIL filed suit in New Jersey.
Moreover, this argument is belied by the fact that the complaint was filed here while the Georgia action was still pending. Without question, the New Jersey claims had accrued before the Georgia action ended since they were asserted while the Georgia action was still pending. And, even if we were to take a leap of faith and assume the New Jersey claims only became known to BDIL at or about the time the complaint was filed here, BDIL has not shown that the Georgia court would not have permitted the counterclaim to be amended to include these claims at the time the action here was commenced. The Georgia rules governing the amendment of pleadings are every bit as liberal as our own. Compare O.C.G.A. § 9-11-15 (permitting the filing of amended pleadings "as a matter of course and without leave of court at any time before the entry of a pretrial order [and] ... [t]hereafter [with consent or] by leave of court [which] shall be freely given when justice so requires") *1041 with R. 4:9-1 (permitting the filing of amended pleadings, after a responsive pleading is filed, by written consent "or by leave of court which shall be freely given in the interest of justice"). BDIL has not shown that the New Jersey claims could not have been asserted by way of an amended counterclaim in the Georgia suit.
Third, BDIL contends it had the unfettered right to file this second suit without fear of the entire controversy doctrine solely because the first suit was still pending. We find no support for this contention. Indeed, our acceptance of the argument that such a bright line rule exists would encourage the type of forum shopping and fragmentation of controversies the entire controversy doctrine was intended to preclude.
Although we said in one case that "the entire controversy doctrine only precludes successive suits involving related claims," Kaselaan & D'Angelo Assocs., Inc. v. Soffian, 290 N.J.Super. 293, 299, 675 A.2d 705 (App.Div.1996) (emphasis added), which on the surface would appear to support BDIL's argument, that statement was made in a context quite different than that at hand. In Kaselaan & D'Angelo, as well as Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co., 142 N.J. 336, 662 A.2d 536 (1995), upon which the former relied, the effect of a suit filed in state court during the pendency of a federal suit was considered. Our courts have shown no hostility toward the plaintiff who files such multiple suits because of the risk that the plaintiff may be barred from federal court due to lack of subject matter jurisdiction. Absent a second suit in state court, the dismissal of the initial federal suit on jurisdictional grounds could potentially prove fatal to the plaintiff's attempt to obtain anywhere an adjudication on the merits. This potential outcome provides a sound basis for permitting multiple pending actions arising out of the same operative facts without offending the objectives of the entire controversy doctrine. It is in that context that we said the entire controversy doctrine applies only to "successive" suits.
What occurred in those cases, however, is not what was presented here. The parties to this suit were also parties to the Georgia suit, the claims that BDIL asserted here could have been asserted in the Georgia suit, and no limit on subject matter jurisdiction has been suggested as potentially interfering with a disposition of the New Jersey claims, by way of a Georgia counterclaim.
Moreover, Mortgagelinq and Kaselaan & D'Angelo recognized that in the federal/state setting the entire controversy doctrine was not necessarily precluded, only deferred. That is, those authorities reveal that the entire controversy doctrine could be applied once the first action was concluded depending upon how the first action ended. Upon dismissal of a federal suit on jurisdictional grounds, as a general matter, the second state court action will likely be permitted to be maintained. But, as Mortgagelinq and Kaselaan & D'Angelo held, when a federal suit is adjudicated on its merits, then the potential arises for a dismissal of the second suit on entire controversy grounds. Mortgagelinq, supra, 142 N.J. at 347 n. 4, 662 A.2d 536; Kaselaan & D'Angelo, supra, 290 N.J.Super. at 301 n. 1, 675 A.2d 705.[3] Here, even if we accept the applicability of the fact-specific Mortgagelinq *1042 and Kaselaan & D'Angelo holdings to this case, BDIL's argument must fail because the Georgia courts ultimately adjudicated all the parties' pleaded disputes on their merits.
For these reasons, we reject the argument that BDIL's action may proceed because it was not a "successive suit" but was filed when the Georgia action was still pending.[4]
Fourth, BDIL's argument that the trial judge should have only dismissed the action without prejudice is also without merit. On this point, BDIL is correct in only one sense. The determination that this second action between the parties may not be maintained here because of the entire controversy doctrine is "a final adjudication for purposes of any further New Jersey proceedings." Mortgagelinq, supra, 142 N.J. at 347, 662 A.2d 536. Our authority to dismiss this case goes no further than our jurisdiction and our judgment imposes no limit on the commencement of an action by BDIL in some other jurisdiction. Accordingly, the order under review may be understood as correctly barring with prejudice this action and barring as well any further or future claim in our courts based upon the transactions or series of transactions that are addressed in either the Georgia action or the action commenced here. Whether the order under review poses a bar to a suit outside our jurisdiction is not for us to say but for some other court to construe.
For these reasons, we affirm the dismissal of this action with prejudice. We find all other arguments asserted by BDIL to be of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
Before concluding our remarks in this case, however, we find it necessary to add one other thing. As we have observed, BDIL had a full and fair opportunity to plead and prove in Georgia the claims contained in the complaint it filed here. It chose, instead, to abort its counterclaim in Georgia and to attempt to litigate its grievances against Marsh in a far away jurisdiction. Our opinion may be viewed as a condemnation of this type of forum shopping and, indeed, it is. However, we would be remiss if we did not also single out Marsh for similar criticism.
Inexplicably, despite BDIL's blatant attempt to bifurcate the parties' disputes and litigate them separately in different jurisdictions, Marsh remained silent for an unduly considerable length of time. As noted earlier, the complaint was filed on December 3, 2007. Marsh, however, did not immediately seek relief. His motion for summary judgment was not filed until December 18, 2008more than one year after the action was commenced. Arguably, Marsh intended to allow events namely the final adjudication of the earlier suit in the Georgia trial courtto preclude BDIL's ability to assert these claims in Georgia. That is, had Marsh expeditiously sought and obtained dismissal of BDIL's complaint here, BDIL might have still had time to seek leave from the Georgia court to assert these claims by way of an amended counterclaim. By delaying here, Marsh may have intended to allow the courtroom door to shut on BDIL in Georgia. If this was the tactic Marsh sought to pursue by postponing his filing of a motion for summary judgment here, it was certainly effective. But, although parties are entitled to zealously litigate in their own best interests, they also owe the judicial system a *1043 further duty. We deem it the obligation of a litigant to expeditiously move for dismissal when an action is filed in violation of the entire controversy doctrine, and we can foresee the possibility, in different circumstances, of finding an equitable basis for refusing to apply the doctrine when a litigant has unreasonably delayed in its assertion.
Affirmed.
NOTES
[1] Although the plaintiff in this action is now ArchBrook Laguna, LLC (ArchBrook), the action was commenced by its predecessor, BDIL. According to the amended complaint filed on September 24, 2008:

ArchBrook was named BDI Laguna, Inc... ., and was incorporated in Georgia, with headquarters in New Jersey. As part of a corporate restructuring, BDIL was merged into BDI Laguna Holdings, Inc. . . . BDI was then reincorporated in Nevada. ArchBrook Laguna Holdings, LLC . . . was started as a new Nevada corporation, and then assumed all of the assets and assumed liabilities of BDI in exchange for granting BDI a preferred stock position. In turn, ArchBrook Holdings contributed assets and liabilities to ArchBrook Laguna, LLC . . ., which is now a wholly owned subsidiary and the operating company of ArchBrook Holdings. ArchBrook is the successor in interest to BDI (and hence, BDIL). ArchBrook has the same headquarters, the same employees, and the same business as the old BDIL. Although ArchBrook is a separate legal entity from BDI, the total business operations, rights, and liabilities of BDIL have been carried over to ArchBrook.
This amended complaint replaced BDIL with ArchBrook as the plaintiff in the action and acknowledged that "ArchBrook is the successor in interest to . . . BDIL." Our disposition of this appeal does not require any further examination of ArchBrook's relationship to its predecessors or the convoluted corporate reorganizations that led to ArchBrook becoming the successor in interest to BDIL because they have no impact on the issues at hand. To avoid any further confusion, we will for the most part refer to the plaintiff in this action as BDIL, which was the company's name when the underlying events in question occurred.
[2] While the appeal here was pending, the Georgia Court of Appeals held that the Georgia trial judge should have granted BDIL's motion for a directed verdict and, as a result, reversed the judgment in favor of Marsh. BDI Laguna Holdings, Inc. v. Marsh, 301 Ga.App. 656, 689 S.E.2d 39 (2009).
[3] In Kaselaan & D'Angelo, we also emphasized the power of the court in the second-filed case to stay the action pending completion of the first as a means of vindicating one of the goals of the entire controversy doctrinethe preservation of judicial resources and the avoidance of duplicative and fragmented litigation. Kaselaan & D'Angelo, supra, 290 N.J.Super. at 299-300, 675 A.2d 705.
[4] Although we see no merit in this aspect of BDIL's argument, we also find that its contention that the entire controversy doctrine could not be implemented until disposition of the first suit was rendered moot once the Georgia suit ended.