**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3590-17T2

ELIZABETH LOPEZ-NEGRON,
individually and on behalf of
all others similarly situated,

      Plaintiff-Appellant,

v.

PROGRESSIVE CASUALTY
INSURANCE COMPANY,
PROGRESSIVE GARDEN STATE
INSURANCE COMPANY,
PROGRESSIVE FREEDOM
INSURANCE COMPANY, and
DRIVE NEW JERSEY
INSURANCE COMPANY,

      Defendants-Respondents.

_____

ELIZABETH LOPEZ-NEGRON,
individually and on behalf of
all others similarly situated,

      Plaintiff-Appellant,

v.

PROGRESSIVE DIRECT

INSURANCE COMPANY,

    Defendant-Respondent.

_____

Argued May 28, 2019 – Decided June 18, 2019

Before Judges Sabatino, Haas and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket Nos. L-0779-15 and L-4577-15.

Jeremy E. Abay argued the cause for appellant (Sacks Weston Diamond, LLC and Dilworth Paxson, LLP, attorneys; John K. Weston (Sacks Weston Diamond, LLC) of the Pennsylvania bar, admitted pro hac vice, Jeremy E. Abay, Thomas S. Biemer, Jerry R. DeSiderato, and Erik L. Coccia, on the briefs).

Michael K. Loucks (Skadden, Arps, Slate, Meagher & Flom, LLP) of the Massachusetts bar, admitted pro hac vice, argued the cause for respondents (Carl D. Poplar, P.A. and Michael K. Loucks, attorneys; Michael K. Loucks, of counsel; Carl D. Poplar, on the briefs).

PER CURIAM

    This case returns two years after our 2017 opinion reversing the Law Division's <u>Rule</u> 4:6-2(e) dismissal of plaintiff's complaint for failure to state a claim. <u>Lopez-Negron v. Progressive Cas. Ins. Co.</u>, No. A-1632-15 (App. Div. Mar. 6, 2017). On remand, after related federal qui tam litigation settled, the

Law Division dismissed the complaint again, this time on entire controversy grounds.

For the reasons that follow, we reverse and again reinstate plaintiff's state court action.

I.

The Factual Background

We discussed the factual background underlying Lopez-Negron's complaints in our prior opinion, Lopez-Negron, slip op. at 4-15, and incorporate that full discussion here. The following brief summary will suffice, recognizing that plaintiff's factual allegations have yet to be explored through complete discovery or tried.

New Jersey's Fair Automobile Insurance Reform Act, L. 1990, c. 8, § 6, amended N.J.S.A. 39:6A-4.3(d), a provision of the Automobile Insurance Cost Reduction Act, N.J.S.A. 39:6A-1.1 to -35, to require that automobile insurers offer applicants the option to designate their health insurance provider as the primary payer of Personal Injury Protection ("PIP") benefits. Plans providing such a designation are often referred to as "health-first" policies, whereby the auto insurer serves as a secondary payer for injuries that policyholders sustain in motor vehicle accidents. See N.J.S.A. 39:6A-4.3(d). However, Medicare and

3

Medicaid recipients cannot qualify for "health-first" policies. See N.J.A.C. 11:3-14.5(a). Federal law generally requires Medicare and Medicaid to be secondary payers of last resort if a primary payer exists. See 42 U.S.C. § 1395Y(b)(2)(A)(ii); 42 C.F.R. § 433.139 (2018).

Plaintiff Elizabeth Lopez-Negron, who was covered by Medicare, applied for automobile insurance with Progressive online. She obtained a "health-first" plan from Progressive despite her ineligibility. The online application process used by Progressive posed a number of questions, including asking if the applicant had health insurance and if this insurance covers injuries from an accident. If the applicant answered yes, Progressive's website recommended the applicant obtain a "health-first" policy. Elsewhere on Progressive's website, and in optional "pop-ups" on the digital application, Progressive elaborated with more details about the "health-first" option.

Progressive did not obtain other information about Lopez-Negron's health insurance coverage and Medicare status until after she was in the auto accident leading to the present controversy.

In May of 2010, Lopez-Negron was in a motor vehicle accident. She received treatment from Diagnostic Imaging, Inc. ("Diagnostic"), Oxford Health

Care PC ("Oxford"), Aria Health System ("Aria"), and the City of Philadelphia EMS Division.

Particularly relevant to the state claims are the x-rays plaintiff received from Diagnostic. Diagnostic submitted its bills to Progressive. Progressive's claims adjuster denied the bills because Lopez-Negron had a "health-first" auto policy. Diagnostic then submitted its bills to Medicare, and Medicare paid for the two x-rays.

Lopez-Negron filed a bodily injury claim against the third-party tortfeasor in the accident and received a settlement from that driver's insurer. Medicare placed a subrogation lien on the settlement proceeds.

Plaintiff's Federal Qui Tam Complaint

In January 2014, Lopez-Negron filed a qui tam action on behalf of the United States and the State of New Jersey against Progressive Casualty Insurance Company and Progressive Garden State Insurance Company ("Progressive") in the United States District Court for the District of New Jersey.[1] The federal complaint alleged claims under the False Claims Act

---

[1] The federal and state actions list different defendants, but all defendants in the federal action are included in plaintiff's state actions. Accordingly, we will refer to defendants collectively as "Progressive."

A-3590-17T2

("FCA"), 31 U.S.C. §§ 3729-3733, and state law claims under the New Jersey False Claims Act ("NJFCA"), N.J.S.A. 2A:32C-1 to -18. Generally, the federal complaint alleged Progressive engaged in "an illegal scheme by which [the insurance company] exploited New Jersey auto insurance law to avoid paying medical benefits to motor vehicle accident victims by causing healthcare providers to submit false and fraudulent claims to Medicare and Medicaid."

The federal complaint was initially filed in camera and under seal, pursuant to the requirements of the FCA and NJFCA, which allow the United States and New Jersey to review such complaints before deciding whether they will intervene in the matter. 31 U.S.C. § 3730(b)(2); N.J.S.A. 2A:32C-5(c) to (d).

On March 11, 2015, the United States declined to intervene in the qui tam case, and the district court subsequently unsealed the federal complaint on March 17, 2015. The State of New Jersey likewise declined to intervene on August 3, 2015. Negron v. Progressive Cas. Ins. Co., Civ. No. 14-577 (NLH/KMW), 2016 U.S. Dist. LEXIS 24994, at *2 n.2 (D.N.J. Mar. 1, 2016).

The New Jersey Class Action Complaint

Meanwhile, in February 2015, Lopez-Negron filed a class action complaint (Docket No. L-779-15) in the Law Division, pursuant to Rule 4:32,

6                                                          A-3590-17T2

against Progressive Casualty Insurance Company, Progressive Garden State Insurance Company, Progressive Freedom Insurance Company, and Drive New Jersey Insurance Company. The class action complaint raises claims against Progressive under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1 to -20, the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWA"), N.J.S.A. 56:12-14 to -18, plus common-law claims of fraud, unjust enrichment, breach of contract, and bad faith.

Lopez-Negron brought the class action "on behalf of all Medicare and Medicaid beneficiaries who have purchased New Jersey auto insurance policies from Defendants that, in violation of State and Federal law, deem Medicare or Medicaid the primary payer of medical expenses," including those who had a Medicare or Medicaid lien levied on a third-party recovery as a result of this purchase. The Law Division complaint alleges that "[a]s a direct and proximate result of Defendants' unconscionable commercial practices, Plaintiff and members of the Class suffered loss, including paying for insurance policies that were in violation of applicable law, and the imposition of Medicare and Medicaid liens." As such, Lopez-Negron seeks various forms of relief, including statewide class certification, injunctive relief, and damages.

In December 2015, Lopez-Negron filed a second class action complaint in the Law Division against another Progressive entity, Progressive Direct Insurance Company (Docket No. L-4577-15). This complaint was substantively identical to plaintiff's initial class action complaint. Lopez-Negron asserts that she discovered the identity of this fifth Progressive defendant during the first appeal in the state action, and that she filed the separate complaint to toll the statute of limitations.

Pursuant to a consent order, this second state action was stayed pending the resolution on appeal of the first state action. The consent order also specified that the matter "shall be consolidated" with the first state action once the appeal was resolved.

<u>Motions to Dismiss</u>

Progressive filed separate motions to dismiss the complaint in both the federal and state cases. In each instance, Progressive argued that Lopez-Negron failed to present a viable claim upon which relief may be granted.

<u>The Federal Motion to Dismiss</u>

In the federal case, Progressive moved to dismiss the case under Fed. R. Civ. P. 12(b)(6) in June 2015. Progressive attached plaintiff's class action

A-3590-17T2

complaint as an exhibit in its motion to dismiss, but evidently did not raise the entire controversy doctrine or any related fragmentation issues at that time.

On March 1, 2016, the district court denied Progressive's motion to dismiss, finding that Lopez-Negron sufficiently pled her FCA and NJFCA claims. Negron, 2016 U.S. Dist. LEXIS 24994, at *2. The court specifically found in its detailed written opinion that Lopez-Negron met her pleading burden under the FCA, which requires a plaintiff to show "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." Id. at *14 (quoting Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 182 (3d Cir. 2001)).

The Motion to Dismiss the Law Division Case and the First Appeal

Meanwhile, in June 2015, Progressive moved to dismiss the state class action complaint under Rule 4:6-2(e) for failure to state a claim. Progressive also moved to strike the class allegations as deficient under Rule 4:32-1.

The Law Division granted Progressive's motion to dismiss on November 5, 2015, finding Lopez-Negron's claims not viable as a matter of law. The Law Division did not rule upon Progressive's motion to strike the class claims.

Lopez-Negron appealed the Law Division's grant of Progressive's motion to dismiss. Progressive did not argue the entire controversy doctrine or object to the existence of the simultaneous federal and state actions in its motion to dismiss or in its initial briefs on appeal. The federal complaint, however, was attached as an exhibit to Progressive's Law Division motion.

Before oral argument in the first appeal, this court requested supplemental briefs on "the propriety of the federal qui tam lawsuit and the state court lawsuit being litigated simultaneously," and specifically discussing "the applicability of the doctrines of single controversy, issue preclusion, and claim preclusion and any other related doctrines, as well as whether the state law claims could be or could have been addressed by the federal court as matters within its supplemental jurisdiction." The parties responded, with Progressive arguing to the court for the first time that Lopez-Negron's claims should be precluded under the entire controversy doctrine.

On March 6, 2017, in an unpublished opinion, this court vacated the dismissal order and remanded the case to the Law Division. Lopez-Negron, slip op. at 3. Among other things, we concluded the Law Division had impermissibly "decided fact-dependent matters of knowledge, intent, feasibility and reasonableness" at the motion to dismiss phase. Ibid.

A-3590-17T2

In remanding this case to the trial court in 2017, we noted "the duplicative nature of the overall litigation clearly raises the specter of potential inconsistent factual and legal determinations, not to mention the arguably wasteful expenditure of scarce judicial resources." Lopez-Negron, slip op. at 39. We instructed that these forum concerns "be addressed by the Law Division promptly on remand." Id. at 40. We stated in this regard:

> More specifically, plaintiff shall be afforded thirty days to move, if she wishes, for leave to amend her complaint in the federal action to include, by way of supplemental jurisdiction, all of the additional state-law claims included in her present Law Division action. We do not, of course, presume how the district court would rule on such a motion, especially given the amount of time that already has been expended in the federal case. In any event, the Law Division may properly take into account whether plaintiff has attempted to invoke the supplemental jurisdiction of the federal court, in deciding whether single controversy or other principles weigh against allowing the Law Division case to proceed at the same time the federal action is ongoing.
>
> At the very least, if the Law Division judge decides to allow this case to continue into the discovery phase, the judge and counsel should consider coordinating discovery with the discovery in the federal action.
>
> We suggest that the Law Division convene a case management conference within forty-five days of this opinion, at which opportunity the court and counsel may explore these and other forum and procedural concerns.

11

[Id. at 40-41].

Post-Remand Proceedings

Motion for Leave to Amend and Stay

Following this court's remand, Lopez-Negron filed a motion in the district court for leave to amend her federal complaint to include the state claims. The New Jersey action was stayed pending the resolution of the federal action. Each side was allowed to file a motion to dissolve the stay or extend the stay after the motion to amend the complaint in the district court was decided.

The district court held off ruling on the motion as the parties attempted to settle the federal claims. This delay was apparently due to a consensus between both parties and the court to wait and see if the federal claims settled.

On September 12, 2017, the district court dismissed Lopez-Negron's motion to amend because of a "September 11, 2017 letter advising that a tentative settlement ha[d] been reached." The court noted that Lopez-Negron could "refile the motion if the settlement [was] not consummated."

Partial Discovery in the Federal Case

Before the federal case settled, the parties conducted a partial amount of discovery. Lopez-Negron describes this discovery as being limited to damages, specifically "to determining which health-first policyholders were insured by

12                                                                    A-3590-17T2

Medicare/Medicaid at the time of their respective auto accidents, then obtaining and sorting through Medicare/Medicaid data to identify which claims should have been paid by Progressive." Progressive describes the federal discovery as "extensive," and including "document discovery, responding to interrogatories and seeking policy and claims information from Medicare and Medicaid going as far back as 2008 for individuals who had made claims on Progressive policies during that time." In any event, there were no depositions taken or expert reports exchanged.

A proposed joint discovery plan filed on August 23, 2017 states that after Progressive responded to Lopez-Negron's initial document requests and interrogatories and made additional productions in the fall of 2016, the parties "agreed to focus discovery on potential damages in an effort to reach an early resolution of this matter through settlement."

The Federal Settlement

On November 14, 2017, the United States, the State of New Jersey, Lopez-Negron, and Progressive entered into a settlement agreement in the federal qui tam action. Without any admission of wrongdoing, Progressive agreed to pay $1,380,000 plus interest in settlement to the United States and $620,000 plus interest to the State of New Jersey. The settlement agreement provided that the

13

United States and New Jersey would pay Lopez-Negron thirty percent of these settlement amounts. Progressive also was to pay Lopez-Negron $212,700 "as payment for attorney's fees" and $180,000 "for costs and expenses in connection with the Civil Action."

The settlement agreement specified that the United States and New Jersey "release the Progressive Entities from any civil or administrative monetary claim that the United States or New Jersey has for the Covered Conduct" under various statutes and common law theories. Lopez-Negron, as relator, released "the Progressive entities from any civil monetary claim the Relator has on behalf of the United States or New Jersey for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733, the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, or the Medicare Secondary Payer Act, 42 U.S.C. § 1395y."

The United States and New Jersey specifically reserved claims in the settlement, such as those involving any criminal liability or liability arising under the Internal Revenue Code. There is not a similar provision reserving specific claims for Lopez-Negron.

On February 15, 2018, the district court issued an order dismissing the claims in the federal case, pursuant to the settlement agreement.

Progressive's Motion to Preclude the State Action

Following the federal settlement agreement, the stay of the Law Division case was lifted through a consent order in November 2017.  Progressive then filed a "Motion to Preclude the Complaint Under R. 4:30A."  Progressive also filed a motion to strike the class allegations.

On March 16, 2018, a different Law Division judge who had been assigned the case ("the second judge") issued an oral opinion, after hearing argument from the parties.  The judge's opinion and companion order granted Progressive's motion to preclude the state complaint under Rule 4:30A and dismissed all of Lopez-Negron's claims with prejudice.

In his oral opinion, the second judge found it was clear that the state and federal actions involved the same parties, facts, and series of transactions, and observed the "core . . . of the matter is the same in . . . both actions."  The judge was persuaded that Lopez-Negron "recognized that these were the same core controversies" when she moved to have the state claims included in the federal case.  The judge also found that if Lopez-Negron wanted to preserve these state claims, that should have been made explicit in the settlement agreement, pointing out that, by comparison, the United States and New Jersey both expressly reserved claims in the settlement agreement.  The judge was persuaded

that Lopez-Negron should have included the state claims in the federal action, and that the state claims should be dismissed under the entire controversy doctrine. The judge also concurrently granted Progressive's motion to strike the class claims, because Lopez-Negron no longer had standing as a class representative.

II.

Although the parties make a variety of arguments, sub-arguments, and counter-arguments, the core of this appeal is whether the Law Division appropriately relied upon the entire controversy doctrine in dismissing plaintiff's state court complaint with prejudice. We conclude it erred in doing so.

The entire controversy doctrine is an equitable preclusion doctrine that "seeks to assure that all aspects of a legal dispute occur in a single lawsuit." Olds v. Donnelly, 150 N.J. 424, 431 (1997). As our Supreme Court recently reiterated, "The entire controversy doctrine 'seeks to impel litigants to consolidate their claims arising from a single controversy whenever possible.'" Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 98 (2019) (quoting Thornton v. Potamkin Chevrolet, 94 N.J. 1, 5 (1983)). "The doctrine serves 'to encourage complete and final dispositions through the avoidance of piecemeal decisions and to promote judicial efficiency

and the reduction of delay.'" Ibid. (quoting Wadeer v. N.J. Mfs. Ins. Co., 220 N.J. 591, 610 (2015)).

The doctrine generally disfavors successive suits regarding the same controversy. See DiTrolio v. Antiles, 142 N.J. 253, 267 (1995). Therefore, when a party fails to assert a claim that the entire controversy doctrine required be joined in an action, the court has the authority to bar that claim. R. 4:30A.

Even so, "the boundaries of the entire controversy doctrine are not limitless. It remains an equitable doctrine whose application is left to judicial discretion based on the factual circumstances of individual cases." Highland Lakes Country Club & Cmty. Ass'n v. Nicastro, 201 N.J. 123, 125 (2009) (quoting Oliver v. Ambrose, 152 N.J. 383, 395 (1998)). As such, "the polestar for the application" of the doctrine is "judicial fairness," and "a court must apply the doctrine in accordance with equitable principles, with careful attention to the facts of a given case." Dimitrakopoulos, 237 N.J. at 114 (quoting K-Land Corp. No. 28 v. Landis Sewerage Auth., 173 N.J. 59, 74 (2002)).[2]

---

[2] We appreciate the helpful supplemental briefs of counsel we requested addressing the Supreme Court's opinion in Dimitrakopoulos, as well as the excellent written and oral advocacy of both parties in grappling with this procedurally complicated matter.

The Supreme Court has expressed three "significant concerns" supporting preclusion under the entire controversy doctrine: "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." Id. at 108 (quoting Wadeer, 220 N.J. at 605). The doctrine should not be applied "where to do so would be unfair in the totality of the circumstances and would not promote any of its objectives, namely, the promotion of conclusive determinations, party fairness, and judicial economy and efficiency." Id. at 114 (quoting K-Land, 173 N.J. at 70). When analyzing fairness, "courts should consider fairness to the court system as a whole, as well as to all parties." Wadeer, 220 N.J. at 605.

In ruling on Progressive's motion to dismiss plaintiff's state court action on entire controversy principles, the Law Division focused largely upon the overlap between the federal and state litigations, as well as considerations of judicial economy. These are surely relevant and important parts of the analysis.

We concur with the Law Division that there was a substantial overlap between the allegations Lopez-Negron pled in her federal lawsuit and those she pled in the Law Division. Plaintiff eventually acknowledged that when she

18

moved to file her supplemental claims in the district court. Except for the qui tam feature of the federal action that swept in the United States and the State of New Jersey, there is a common identity of parties in the two lawsuits: Lopez-Negron and Progressive (or its various related companies). The operative allegations as to Progressive's allegedly-flawed website process for obtaining a "health-first" auto policy are essentially the same.

The basic theme of both lawsuits – i.e., that Progressive misled Medicare and Medicaid recipients into buying health-first policies for which they were ineligible – is repetitive.

To be sure, the federal qui tam case focused on the alleged damages to the government programs in making erroneous Medicaid or Medicare payments on claims until the mistaken health-first elections were discovered. In addition, plaintiff's federal complaint invoked different federal and state laws to support liability than in the Law Division case. On the whole, however, the second Law Division judge was correct in recognizing the substantial overlap and duplicative aspects of the two cases.

To a certain extent, these two actions raise concerns about the duplicate consumption of resources in the two forums, and the inherent risks of inconsistent determinations had both cases been decided on their merits. As of

19

this point, the lawsuits have taken the time and attention of a United States District Judge, a United States Magistrate Judge, a private mediator, two Law Division judges, and four Appellate Division judges.[3] Additional time and effort was expended in the two courts by their respective administrative personnel in judges' chambers and in the clerks' offices, over the course of several years. It surely would have been more economical and efficient, if possible, to have this case processed, managed, and adjudicated in one courthouse, and not two.

Plaintiff points out that the distinctive features of qui tam litigation, in which she functioned as a "relator" bringing claims of injury on behalf of the governments, provides ample justification for her decision to litigate the same core allegations in the two forums. At oral argument on appeal, counsel represented to the court that the United States Government has taken the legal position that it has the unilateral authority to control the course of a qui tam action, including the power to dismiss the case on its own motion. In addition, plaintiff argues that it is by no means certain the federal court would have

---

[3] We appreciate that the second Law Division judge and the fourth Appellate Division judge were brought into the case as the result of periodic judicial reassignments, and annual changes in the appellate "Parts." Even so, the cumulative time spent by the respective jurists would be substantial, even if those administrative reassignments had not occurred.

granted her motion to amend her complaint in that forum to include the additional state-law claims and exercised supplemental jurisdiction over them under 28 U.S.C. § 1367. We need not comment or rule upon these issues of federal law, other than to express our recognition that this dual-forum procedural context is complicated, and that it might not necessarily have been feasible for plaintiff's entire "bucket" of claims to be poured into one venue.

The separate state and federal actions did raise risks of inconsistent adjudications in the two forums. For example, the fact-finder in the federal case (say, the district judge in an injunctive hearing, or a jury at a trial on liability or damages) hypothetically might find plaintiff and her witnesses credible and Progressive's witnesses not credible, while a state judge or jury might find the opposite. Or the federal decision-maker(s) might find that plaintiff had failed to meet her burden of proving her core allegations of wrongdoing, while the state decision-maker(s) might be persuaded she did meet her burden. Indeed, the first Law Division judge and the district judge diverged sharply in their perceptions as to whether Progressive's website application process for "health-first" policies was misleading or otherwise flawed.

Plaintiff suggests that the prospect of inconsistent adjudications can adequately be addressed by the courts. For example, the court could stay the

state court action while the federal case proceeded. If and when the federal case was decided on its merits, the federal findings may have certain preclusive effects in the state court case under principles of collateral estoppel. Although that approach may have advantages, the resulting preclusive impacts might well be disputed, particularly if the findings or a jury verdict in the federal case had any ambiguities or material omissions. See Winters v. N. Hudson Reg'l Fire and Rescue, 212 N.J. 67, 95-96 (2012) (articulating that collateral estoppel is an equitable doctrine requiring satisfaction of five factors, including that the determination of the issue for which collateral estoppel is sought be "essential to the prior judgment"). Moreover, the losing party in the federal case could seek appellate review in the Third Circuit Court of Appeals, which would prolong the uncertainty. As Oliver Hardy used to say to his sidekick Stan Laurel, conducting a post-federal preclusion analysis here could easily turn out to be "another fine mess."[4]

That said, the original risks presented of inconsistent adjudications have now evaporated because the federal action has settled, with no ultimate findings of liability or damages. Moreover, the United States and the State of New Jersey

_____

[4] See, e.g., Another Fine Mess (Hal Roach Studios 1930). There is some debate about whether Hardy's actual quote is "another nice mess."

have received their monetary recoveries and are no longer involved, so the remaining lawsuit is now a two-party dispute.[5] The matter therefore is in a much different posture than it was in 2017 when the first appeal was before this court. Hence, no further weight should be given to the inconsistency concern, at least prospectively. The federal case is over and done with.

As we have already noted, the federal settlement documents are silent about the claims pending in the Law Division. Neither plaintiff nor Progressive attempted to include those remaining state-court claims as part of a potential global settlement, although nothing legally prevented either side from making such an attempt.

Progressive essentially argues that plaintiff waived its remaining state-law claims by failing to insist upon language in the federal settlement preserving those claims. Conversely, plaintiff argues that Progressive waived its right to object to the Law Division case going forward, in part because it missed a chance to wrap those claims into a global settlement. We adopt neither interpretation of the omission of the Law Division claims. The federal disposition simply is what it is: a partial and consensual resolution of the overall controversy between

---

[5] We make no advisory comments about whether this case is appropriate for class certification, or whether Lopez-Negron is a suitable class representative.

A-3590-17T2

plaintiff and Progressive. Neither side was obligated to negotiate a resolution of the state claims in the federal settlement.[6]

Having made these observations, we turn to the most salient factor that must guide our analysis of the entire controversy doctrine for this case: the principles of equity and fairness. The Supreme Court stressed this factor in Dimitrakopoulos, 237 N.J. at 114-15. As the Supreme Court reiterated, in remanding that case for the trial court to conduct a weighing of equitable factors, "'the polestar for the application of the [entire controversy] rule is judicial fairness.'" Id. at 114 (alteration in original) (quoting K-Land, 173 N.J. at 74). The court must consider the "totality of the circumstances" in evaluating whether it should apply the doctrine to preclude an action. Id. at 119.

The second Law Divisions judge's oral opinion in this case was delivered before the Supreme Court issued Dimitrakopoulos, with its emphasis on equity and fairness. The oral opinion does not elaborate much upon these equitable considerations. Given the posture of this case, we have sufficient information

_____

[6] We do not read our opinion in Archbrook Laguna, LLC v. Marsh, 414 N.J. Super. 97 (App. Div. 2010), to mandate dismissal of the present case. Unlike the present matter, the plaintiff in that case had previously voluntarily dismissed claims it had brought in a separate action in another state, and then attempted to revive them in a New Jersey action. Id. at 102-03. Additionally, the litigation in another state ended after a jury trial that involved specific findings on the merits of the out-of-state case. Id. at 104.

before us to evaluate the equitable factors rather than delegate reconsideration to the trial court in light of Dimitrakopoulos and provoke even further appellate review.

After reflecting upon the parties' arguments and the rather idiosyncratic path of the federal and state court actions, we conclude that the equitable factors weigh in favor of allowing plaintiff's yet-to-be-adjudicated state law claims to go forward. There is no allegation that existence of the federal qui tam action was not duly disclosed to Progressive when that case was unsealed shortly after the Law Division case was filed. Progressive knew all along that it was defending both the federal and state cases based on a common core set of factual allegations.

When it initially moved to dismiss the Law Division action, Progressive exclusively invoked Rule 4:6-2(e) (failure to state a claim), and did not raise the entire controversy doctrine as a separate independent ground for dismissal. It was not until this court, sua sponte, inquired into the subject before oral argument on the first appeal and requested supplemental briefing, that the entire controversy concern came to the fore.

Case law instructs that the entire controversy doctrine is an affirmative defense, which can be waived if not timely asserted. Aikens v. Schmidt, 329

A-3590-17T2

N.J. Super. 335, 339-40 (App. Div. 2000). Although Progressive complains about having to endure four years of litigation, it could have attempted to forestall the duplicative and piecemeal actions by asking the court to bar the Law Division case with an early motion. It chose not to do so, perhaps for strategic reasons that are not obvious on the surface. Although we do not rule that Progressive "waived" its right to invoke the entire controversy doctrine, the belated timing of its argument, prompted by this court's sua sponte inquiry in 2017, is at least relevant to the overall equities presented.

We discern no strong institutional reasons to dismiss the Law Division case at this juncture. Although paper (or digital) discovery of documents was conducted in the federal case, no depositions were yet taken. No expert reports were exchanged. Presumably many of the documents uncovered and supplied in the federal case will be useful in the Law Division case. It is not wasteful or institutionally detrimental for the Law Division case to proceed, now that the federal action has settled. The controversy is no longer fragmented into two forums.

Lastly, we conclude it would be unfair to plaintiff and the putative class members to extinguish these state-law claims before discovery is completed, followed by possible dispositive motions or a trial. As we have noted, plaintiff

A-3590-17T2

could not entirely control the path of the qui tam claims, and it was not clear if the federal court would have exercised supplemental jurisdiction over the state claims if it reached the merits of that motion. We also recognize, as did the district judge in the cognate action, that plaintiff's allegations of improper conduct, as pleaded, had enough potential merit to survive a motion to dismiss for failure to state a viable claim.

For these reasons, we reverse the trial court's dismissal order and reinstate the case in the Law Division. The trial judge shall convene a case management conference within thirty days to plan the remaining discovery and pretrial motions, including the disposition of class certification issues.

To the extent we have not commented on other points raised by both parties, we have fully considered them but conclude they lack sufficient merit or importance to require written comment. R. 2:11-3(e)(1)(E).

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3590-17T2